No. 26-1532

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

DEMOCRACY NORTH CAROLINA, LEAGUE OF WOMEN VOTERS OF NORTH
CAROLINA, and NORTH CAROLINA BLACK ALLIANCE,

*Plaintiffs-Appellants*,

v.

FRANCIS X. DE LUCA, in his official capacity as CHAIR OF THE STATE BOARD OF
ELECTIONS; STACY EGGERS, IV, in his official capacity as SECRETARY OF THE STATE
BOARD OF ELECTIONS; JEFF CARMON, in his official capacity as MEMBER OF THE
STATE BOARD OF ELECTIONS; ANGELA HAWKINS, in her official capacity as MEMBER
OF THE STATE BOARD OF ELECTIONS; SIOBHAN O'DUFFY MILLEN, in her official
capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; SAM M. HAYES, in his
official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS;
NORTH CAROLINA STATE BOARD OF ELECTIONS,

*Defendants-Appellees*,

and

PHILIP BERGER, in his official capacity as PRESIDENT PRO TEMPORE OF THE NORTH
CAROLINA SENATE; DESTIN HALL, in his official capacity as SPEAKER OF THE NORTH
CAROLINA HOUSE OF REPRESENTATIVES,

*Intervenors-Appellees.*

_____

Appeal from the United States District Court for the Middle District of North Carolina
Case No. 1:23-cv-878, The Honorable Thomas D. Schroeder

_____

**OPENING BRIEF OF APPELLANTS DEMOCRACY NORTH CAROLINA,
LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA,
and NORTH CAROLINA BLACK ALLIANCE**

_____

(counsel listed on reverse)

Jeffrey Loperfido
Christopher Shenton
Adrianne M. Spoto
Hilary H. Klein
Helena Abbott
Lily Talerman
SOUTHERN COALITION FOR
SOCIAL JUSTICE
PO BOX 51280
Durham, NC 27717
919-794-4213
jeffloperfido@scsj.org
chrisshenton@scsj.org
adrianne@scsj.org
hilaryhklein@scsj.org
helena@scsj.org
lily@scsj.org

Michael Dockterman
Laurel Taylor
Kristin Hendriksen
MCDERMOTT WILL & SCHULTE
LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
312-984-7730
mdockterman@mcdermottlaw.com
ltaylor@mcdermottlaw.com
khendriksen@mcdermottlaw.com

Rachel Cannon
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
312-577-1270
rcannon@steptoe.com

Michelle Kallen
Laura Niday
STEPTOE LLP
1330 Connecticut Ave NW
STE Office 785
Washington, DC 20036
202-429-6415
Mkallen@steptoe.com
Lniday@steptoe.com

***Counsel for Democracy NC, League
of Women Voters of North Carolina,
and North Carolina Black Alliance,
Plaintiffs-Appellants***

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  26-1532          Caption:  Democracy North Carolina v. De Luca

Pursuant to FRAP 26.1 and Local Rule 26.1,

Democracy North Carolina
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeffrey Loperfido          Date: 05/04/2026

Counsel for: Appellants

- 2 -

**Print to PDF for Filing**

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1532__          Caption: __Democracy North Carolina v. De Luca__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__League of Women Voters of North Carolina__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                                ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                                     ☐YES ☑NO
       If yes, identify all such owners:

12/01/2019 SCC                              - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?         ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeffrey Loperfido                              Date:      05/04/2026

Counsel for: Appellants

- 2 -

**Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1532__    Caption: __Democracy North Carolina v. De Luca__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__North Carolina Black Alliance__
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC    - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeffrey Loperfido                          Date:        05/04/2026

Counsel for: Appellants

- 2 -

Print to PDF for Filing

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ....................................................3

STATEMENT OF ISSUES ..................................................................3

STATEMENT OF CASE .....................................................................4

SUMMARY OF ARGUMENT ............................................................8

STANDARD OF REVIEW ................................................................10

ARGUMENT .....................................................................................10

    I.    THE DISTRICT COURT ERRED BY FAILING TO CORRECTLY APPLY *ANDERSON-BURDICK* TO PLAINTIFFS' UNDUE BURDEN CLAIM ......................................10

        A.    The district court erred when it treated SDR users as second-class voters in North Carolina's overall election scheme .........12

        B.    Because of its views on SDR, the district court erroneously discounted SB 747's burden .......................................................14

        C.    The district court erred by failing to properly scrutinize the State's justifications for SB 747's changes to SDR..................17

    II.    THE DISTRICT COURT ERRED BY FAILING TO CORRECTLY APPLY *ARLINGTON HEIGHTS* TO PLAINTIFFS' TWENTY-SIXTH AMENDMENT CLAIM .............23

        A.    *Arlington-Heights* is the appropriate legal standard for age-based discrimination under the Twenty-Sixth Amendment .....23

        B.    The district court erred by denying that young voters are a protected class under the Twenty-Sixth Amendment...............26

        C.    The district court's application of the *Arlington Heights* framework was legally flawed .................................................29

i

1.    The district court erred by turning the "sensitive inquiry" into discriminatory intent into a heightened requirement for collective legislative intent ...................29

2.    The district court erred by disregarding the role of election integrity activists in the passage of SB 747 and ignoring clear evidence of their anti-youth animus .........................................................................34

3.    The district court did not properly assess the disproportionate burden that SB 747 imposes on youth voters ..............................................................46

CONCLUSION ....................................................................................54

# TABLE OF AUTHORITIES

**Cases:**                                                                              **Page(s)**

*Abbott v. Perez*,
   585 U.S. 579 (2018)...................................................................................34

*Alexander v. S.C. State Conf. of the NAACP*,
   602 U.S. 1 (2024)......................................................................................35

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)............................................................................ *passim*

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)............................................................................ *passim*

*Brnovich v. Democratic National Committee*,
   594 U.S. 647 (2021)...................................................................... 44, 45, 47

*Burdick v. Takushi*,
   504 U.S. 428 (1992)...................................................................................18

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)...................................................................................42

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
   68 F.4th 864 (4th Cir. 2023) .............................................................. *passim*

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008)...................................................................... 11, 15, 18

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)...................................................................................32

*Eakin v. Adams Cnty. Bd. of Elections*,
   149 F.4th 291 (3d Cir. 2025) ................................................................ 13, 18

*Edwards v. Aguillard*,
   482 U.S. 578 (1987)...................................................................................32

*Fish v. Schwab*,
   957 F.3d 1105 (10th Cir. 2020) .................................................................15

iii

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) ................................................. 10, 11, 18

*Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*,
377 U.S. 218 (1964)................................................................28

*Griffin v. N.C. State Bd. of Elections*,
781 F. Supp. 3d 411 (E.D.N.C. 2025) ....................................16

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663 (1966)................................................................13

*Hunter v. Underwood*,
471 U.S. 222 (1985)................................................................35

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982)................................................................10

*Jesus Christ is the Answer Ministries, Inc. v. Balt. Cty.*,
915 F.3d 256 (4th Cir. 2019) .................................................26

*League of Women Voters of Fla., Inc. v. Detzner*,
314 F. Supp. 3d 1205 (N.D. Fla. 2018) .............................. 25, 27

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .................................................19

*Lee v. Va. State Bd. of Elections*,
843 F.3d 592 (4th Cir. 2016) .................................................25

*Libertarian Party of Va. v. Alcorn*,
826 F.3d 708 (4th Cir. 2016) ............................................. 11, 16

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026)......................................................... 30, 32

*McWright v. Alexander*,
982 F.2d 222 (7th Cir. 1992) .................................................26

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ................................................44

iv

*N.C. State Conf. of the NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ........................................................... *passim*

*N.C. State Conf. of the NAACP v. Raymond*,
  981 F.3d 295 (4th Cir. 2020) ..................................................... 34, 35

*Nashville Student Org. Comm. v. Hargett*,
  155 F. Supp. 3d 749 (M.D. Tenn. 2015) .............................................27

*Nat'l Fed'n of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) .............................................................10

*Ne. Ohio Coal. for the Homeless v. Husted*,
  837 F.3d 612 (6th Cir. 2016) .............................................................16

*Norman v. Reed*,
  502 U.S. 279 (1992) ................................................................... 11, 18

*One Wis. Inst., Inc. v. Thomsen*,
  198 F. Supp. 3d 896 (W.D. Wis. 2016), *rev'd in part on other grounds*,
  *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) .........................................25

*Oregon v. Mitchell*,
  400 U.S. 112 (1970) ..........................................................................24

*Pacific Shores Props., LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) ..................................................... 27-28

*Palmer v. Thompson*,
  403 U.S. 217 (1971) ..........................................................................32

*Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*,
  827 F.3d 333 (4th Cir. 2016) .............................................................10

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ..........................................................................16

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ..........................................................43

*Stout v. Jefferson Cnty. Bd. of Educ.*,
  882 F.3d 988 (11th Cir. 2018) ..........................................................43

*Students for Fair Admissions, Inc. v. Presidents & Fellows of Harvard College*,
    600 U.S. 181 (2023) ................................................................32

*Talbert v. Richmond*,
    648 F.2d 925 (4th Cir. 1981) ................................................30

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) ................................................23

*Tully v. Okeson*,
    78 F.4th 377 (7th Cir. 2023) ................................................25

*United States v. IBM*,
    517 U.S. 843 (1996) ................................................................24

*United States v. O'Brien*,
    391 U.S. 367 (1968) ................................................................32

*United States v. Texas*,
    445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd Symm v. United States*,
    439 U.S. 1105 (1979) ..............................................................27

*United States v. Yonkers Bd. of Educ.*,
    837 F.2d 1181 (2d. Cir. 1987) ......................................... 42, 43

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ................................................41

*Walgren v. Howes*,
    482 F.2d 95 (1st Cir. 1973) ....................................................23

**Statutes & Other Authorities:**

U.S. Const. amend. I ........................................................................13

U.S. Const. amend. XV, § 1 ............................................................23

U.S. Const. amend. XIX ............................................................. 23, 24

U.S. Const. amend. XXIV ..............................................................23

U.S. Const. amend. XXVI ...................................................... *passim*

28 U.S.C. § 1291 ................................................................................3

28 U.S.C. § 1331 ................................................................................................3

42 U.S.C. § 1983 ................................................................................................3

117 Cong. Rec. 7539 .......................................................................................24

N.C. Gen. Stat. § 163-55 .................................................................................20

N.C. Gen. Stat. § 163-57 .................................................................................20

N.C. Gen. Stat. § 163-82.6B ...........................................................................15

N.C. Gen. Stat. § 163-82.7 ................................................................................4

N.C. Gen. Stat. § 163-82.7(g) ......................................................................5, 53

N.C. Gen. Stat. § 163-89 .................................................................................53

N.C. Gen. Stat. § 163-90.1(b) .........................................................................53

House Bill 485 .................................................................................................37

H.R. Rep. No. 92-37 ........................................................................................24

S. Rep. No. 92-26 .............................................................................................24

Senate Bill 747 ........................................................................................ *passim*

**INTRODUCTION**

Senate Bill 747 is a law that restricts same-day registration, a method of voting disproportionately used by young voters, by subjecting those voters to a unique risk that their ballots will be discarded after they are cast due to mail issues unrelated to the voter's eligibility. This election law change did not emerge from a neutral reassessment of election administration; rather it was generated, urged, and justified by "election integrity" activists who view this method of voting and the young voters who use it as unfairly "manipulating" election outcomes.

The district court acknowledged both the origins of Senate Bill 747's new restrictions on same-day registration (or "SDR") and the expected harm to youth and college voters who use that voting method most. The decision details a monthslong influence campaign by Cleta Mitchell and James Womack (of the North Carolina Election Integrity Team) to introduce and embed a substantial limit on SDR into law. It then recounts how youth voters disproportionately utilize SDR, how youth voters disproportionately relied on the protections of the old SDR system to verify their registrations, and how those trends continued into the 2024 elections, when Senate Bill 747 first went into effect.

But the district court made critical legal errors in its application of each of the legal tests for Plaintiffs' constitutional claims. First, in applying *Anderson-Burdick*, the district court treated same-day registrants as an inferior class of voters, entitled

1

to less constitutional protection, because SDR is a form of voting "the state was not required to provide in the first place" and anyone using it made the "choice" to "forego traditional registration." This infected both its assessment of burden and its weighing of the state interests. Second, in applying *Arlington Heights*, the district court required Plaintiffs to prove a collective legislative intent, rather than analyzing whether discrimination was a motivating factor in the law's passage. This too skewed its consideration of robust intent and impact evidence, which erroneously led it to fail to shift the burden to the legislature and to conclude that the law passed muster. The Constitution does not permit a state to codify anti-youth sentiments into a system that subjects targeted voters to a distinct and unjustified risk that their ballots will be rejected through no fault of their own.

When properly applying the appropriate standards, the SDR provision of Senate Bill 747 constitutes an undue burden in violation of the First and Fourteenth Amendments and violates the Twenty-Sixth Amendment's prohibition against age-based discrimination in voting. For these reasons, and those below, the district court decision should be reversed.

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1331, the district court had federal question jurisdiction over the underlying action, which arose under the First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

Following a bench trial, on March 26, 2026, the district court issued its Memorandum Opinion and Order and entered final judgment in favor of defendants on all claims. JA1-109. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's Memorandum Opinion and Order and entry of judgment was a final order that disposed of all parties' claims.

## STATEMENT OF ISSUES

1.      Whether the district court erred in concluding that Senate Bill 747 does not violate the First and Fourteenth Amendments to the U.S. Constitution as an undue burden on the right to vote.

2.      Whether the district court erred in concluding that Senate Bill 747 does not violate the Twenty-Sixth Amendment to the U.S. Constitution.

3

## STATEMENT OF CASE

This case concerns voting restrictions targeting same-day registration in North Carolina that were passed as part of an elections omnibus bill—Senate Bill 747 ("SB 747")—in the fall of 2023. Through SDR, voters can register and cast a ballot at the same time during the early voting period after attesting to their eligibility, completing a registration application, and presenting documentary proof of their residence. JA17, JA106. Youth voters disproportionately use SDR to register and vote. JA2018, JA2025; *see also* JA1209-1210.

Before the passage of SB 747, all eligible North Carolina citizens submitted a completed voter registration application to their local election board (whether using SDR or another form of registration), which initiated a verification mailing sent to their listed address. If the first card was returned as undeliverable, election officials would send a second verification. Only if both verification cards returned as undeliverable would a registrant's application be denied. JA14-15, JA17-18; N.C. Gen. Stat. § 163-82.7. This mail verification process was known to be imprecise and could fail for a variety of reasons unrelated to a voter's qualifications. JA1210-1211. It was particularly challenging and prone to erroneous failures in multi-unit housing dwellings and college student housing. *See, e.g.*, JA1212-1216; *see also* JA1785-1789; JA1861-1862; JA423-424, JA502-503; JA963-964; JA619-620 (each addressing student housing mail verification barriers). Accordingly, the statutory

4

scheme included procedural protections for all voters if their verification cards were returned before voting had occurred or after a ballot had already been cast voting. N.C. Gen. Stat. § 163-82.7(g); JA1200-1205.

SB 747 altered the verification process for only same-day registrants. Under SB 747 as enacted, if a same-day registrant's first verification card is returned as undeliverable by the day before county canvass (when votes are officially counted), the voter is not registered and their ballot must be removed from the count. JA1640-1641; *see also* JA3-4, JA17-20. These ballots would be discarded notwithstanding the fact that voters using SDR provide additional, documentary proof of residence at the time of registration, and still must satisfy the same requirements as other in-person voters. JA17, JA1196-1197. As a result of this change, same-day registrants are no longer assured that their ballots will count even after successfully casting them at the polls.

These new restrictions on SDR were put into law following extensive lobbying by election integrity activists Cleta Mitchell, James Womack, and the North Carolina Election Integrity Team ("NCEIT"). Records from their monthslong influence campaign show them urging legislators to restrict SDR, tying SDR to concerns about college-student voting, and presenting legislators with materials claiming there was a problem with out-of-state college students voting. JA21-32; *see also* JA1807, JA1833-1834, JA1835-1858, JA1859-1860. The State Board of

Elections, by contrast, had not sought changes to SDR and was not concerned that SDR created administrative vulnerabilities that necessitated legislative action. JA33-34, JA1177, JA1187-1188. Nevertheless, legislators heeded these activists' proposal to require same-day registrants to vote provisionally, incorporating it first in a standalone House bill, JA29, JA1909, and then again in SB 747 as first filed, JA29, JA32, JA1755. Though the specific mechanism for restricting SDR changed over the life of the bill, what ultimately passed—the one-mailer verification system—showed that cutting access to SDR and voting remained a legislative priority to the end. JA29, JA32, JA35-37; *see also* JA1186-1187.

Drawing on their experience educating and assisting North Carolina voters (including youth voters), Plaintiffs Democracy North Carolina, North Carolina Black Alliance, and the League of Women Voters of North Carolina challenged SB 747, alleging that SB 747 imposed an undue burden on the right to vote in violation of the First and Fourteenth Amendments and intentionally discriminates against young voters in violation of the Twenty-Sixth Amendment. JA4-5; *see also* JA146-188. SB 747's new restrictions forced Plaintiffs to expend more time and resources running programs to support youth and student voters. JA6-10; *see* JA601-623, JA920-931, JA941-951, JA959-965, JA966-970, JA978-986.[1]

---

[1] This evidence established Plaintiffs' standing at trial, which Defendants did not dispute. JA12-13.

6

During the pendency of this litigation, the district court modified the challenged law in parallel proceedings, granting a preliminary injunction on procedural due process grounds because SB 747 as enacted lacked any provision for giving same-day registrants notice or an opportunity to be heard before discarding their ballots. JA4-5. In response, the State Board of Elections issued a Numbered Memo that mandated a notice-and-cure process for same-day registrants whose single verification card returned as undeliverable before close of business two days before county canvass. JA5, JA1895-1907.[2] Under that process, elections board staff check the listed address against the voter's registration form for data entry errors and, if there are no such errors, attempt to notify the voter by mail (and by phone and email, if they have that information) of the failed verification and opportunity to cure. The voter's ballot is removed from the count unless they submit additional documentary proof of residence by the day before canvass or appear at canvass to testify to the board. JA19-20, JA1900-1903.

Plaintiffs' claims survived motions to dismiss and for summary judgment and were set for trial in October 2025. JA128, JA138. Trial included testimony from Plaintiffs, the bill sponsors (Senator Warren Daniel and Representative Grey Mills),

---

[2] The parties in the parallel action later obtained a consent judgment securing similar procedural safeguards for same-day registrants who failed mail verification. JA5. Thereafter, Plaintiffs voluntarily dismissed their procedural due process claim. JA5, JA228-232.

third party election integrity activists Cleta Mitchell and James Womack, Paul Cox (the general counsel for the State Board of Elections), a county elections director, and the parties' experts. After a five-day bench trial, the district court entered judgment for Defendants on both claims. JA5, JA108. This appeal followed. JA2500.

## SUMMARY OF ARGUMENT

The district court made dispositive legal errors in assessing Plaintiffs' claims.

On undue burden, the district court erred at both stages of the applicable *Anderson-Burdick* framework, which asks courts to weigh the "character and magnitude" of the burden imposed against the "precise interests" put forward by the state, "consider[ing] the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). When assessing burden, the district court erred by casting same-day registrants as a constitutionally inferior class of voters because those voters had made the "choice" to "forego" what the district court called "traditional registration" and thus subjected themselves to whatever risks were attendant to that form of voting. JA84. This misclassification skewed the district court's legal assessment of SB 747's burdens and led it to wrongfully discount the severe *ex post* burden newly imposed on same-day registrants, whose ballots could now be discarded through no fault of their own after they had already been cast (a point in the election when they cannot simply use

8

a different method to vote). The district court then failed to properly evaluate the state's "precise interests" in support of SB 747 and whether those interests make it necessary to increase burdens on same-day registrants, ignoring that the interests it purportedly serves were already better served by the preexisting documentary proof of residence requirement that same-day registrants alone must meet.

As for the Twenty-Sixth Amendment, the district court veered from the correct legal standard: whether discriminatory intent against young voters was a "motivating factor" in SB 747's passage, and if so, whether it would have been enacted even if the impermissible purpose had not been considered. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 & 271 (1977). Instead, the district court improperly required Plaintiffs to prove a collective, overriding discriminatory purpose on the part of the whole General Assembly. This caused the district court to ignore compelling evidence of anti-youth animus in the legislative process and disproportionate impact against youth voters, and to fail to shift the burden to the defenders of the law to show it would have been enacted without that improper purpose.

With both claims, had the district court applied the correct legal standard, it would have found SB 747's changes to SDR to be violative of the U.S. Constitution.

9

**STANDARD OF REVIEW**

The Fourth Circuit "review[s] judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502 (4th Cir. 2016). A factual finding is clearly erroneous if it was made using "incorrect legal standards." *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016). "[I]f the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Id*. at 340 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982)).

In cases where the record "provides 'a complete understanding' of the merits and 'permits only one resolution of the factual issue,'" the appellate court need not remand the case. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 234 (4th Cir. 2016) (internal citations omitted).

**ARGUMENT**

**I.    THE DISTRICT COURT ERRED BY FAILING TO CORRECTLY APPLY *ANDERSON-BURDICK* TO PLAINTIFFS' UNDUE BURDEN CLAIM.**

The *Anderson-Burdick* framework provides a sliding scale of scrutiny on burdens on the fundamental right to vote. If a law imposes a severe burden on that right, strict scrutiny applies. *See Fusaro v. Cogan*, 930 F.3d 241, 257-58 (4th Cir. 2019). If the burden is determined to be less than severe, courts balance "the

10

character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests." *Id.* (citation omitted); *see also Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716 (4th Cir. 2016). Any burden on the constitutional right to vote—"[h]owever slight [it] may appear"—"must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)). So the court "must not only determine the legitimacy and strength of each of" the state interests presented to justify the law, "it also must consider the extent to which those interests *make it necessary* to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (emphasis added).

The district court misapplied this legal framework at each step. First, in assessing the burden imposed, the district court treated same-day registrants as an inferior class of voters, JA84. This framing infected the entire burden analysis. JA82. The district court compounded this mistake by treating the burden imposed by SB 747 as one applied *ex ante* to *all* voters, rather than one imposed *ex post* only on same-day registrants, reasoning that any burden on SDR could be excused so long as other voting options exist. Then, when turning to state interests, the district court failed to scrutinize whether the State's specific interests in SB 747 were legitimate and justified burdening same-day registrants' rights.

11

Each of these errors justifies reversal.

**A.**    **The district court erred when it treated SDR users as second-class voters in North Carolina's overall election scheme.**

At the outset of its analysis, the district court improperly treated same-day registrants as a constitutionally inferior class of voters. The district court invented a distinction between what it called "traditional registration methods" (a category including in-person paper registration and various forms of electronic registration) and same-day registration, which only occurs during the early voting period. JA13-14. It asserted that same-day registration was "for voters who have missed the traditional registration window for a particular election and still wish to vote[.]" JA17. The district court then used this analogy to hold that SB 747's changes to SDR were merely a "condition on the use of a form of voting that the state was not required to provide in the first place." JA82. The district court suggested that this disfavored treatment was justified because, in its view, an "individual's decision to forego traditional registration is almost certainly the product of his or her own choice[.]" JA84.

The district court's distinction was legally erroneous. The two-tiered system of "traditional" versus "same-day" registration adopted by the district court has no basis in North Carolina law and was not supported by any citation to the record or

12

the election statutes.[3] Nor does it exist anywhere in the *Anderson-Burdick* framework or the Constitution itself—and for good reason. There is no limiting principle to such a construction; if a court can simply decide that a particular type of voting has second-class standing, any burdens imposed on that voting method are minimized through nothing more than judicial say-so. Every method of voting is slightly different than others, and that does not, standing alone, furnish lesser or greater constitutional protection for any particular method. *Anderson-Burdick* requires weighing the *actual* burdens imposed by a law, not arbitrarily discounting them on the basis of a distinction, spun from whole cloth, that some types of voting are second-class.

That North Carolina was not required to provide SDR, JA82, is irrelevant. Having established a same-day registration system, that system must operate consistently with the Constitution. *Cf. Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the . . . Fourteenth Amendment."); *Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 308 (3d Cir. 2025) ("Even if no First Amendment right to vote by mail exists, we still must scrutinize Pennsylvania's mail-in voting regime to ensure that it complies with the Constitution"). Treating

---

[3] North Carolina's registration laws make no mention of a "traditional" registration category; instead, they set out the various methods of registering and the specific procedures for each. *See generally* N.C. Gen. Stat. ch. 163, art. 7A.

13

SDR as a second-class voting method shaped the entirety of the district court's analysis of the undue burden claim, resulting in minimized burdens and under-scrutinized justifications.

**B.    Because of its views on SDR, the district court erroneously discounted SB 747's burden.**

Having improperly placed same-day registrants below all other voters, the district court then compounded that error in assessing how SB 747's burdens apply. The district court considered SB 747's effects "alongside all other opportunities" for voting in North Carolina. JA85. This misunderstands where in the voting process the burdens on same-day registrants come to bear. SB 747 imposes entirely *ex post* burdens on same-day registrants. A same-day registrant still goes through the same process as they did pre-SB 747 to register and cast their ballot. But under SB 747's regime, a same-day registrant is exposed to a new, significantly heightened risk that their ballot will be rejected based on a clerical error, either by a poll worker or postal worker. Because this burden comes after the ballot has already been fed into the voting machine, and thus too late for a voter to change course, it requires a different analysis.

Despite this key difference, the district court downplayed SB 747's burdens by pointing to other forms of voting that same-day registrants could have (and in the district court's view, should have, *see* JA84) used. For example, the district court touts North Carolina offering *other* forms of registration (despite SB 747 not

14

applying to these voters), Election Day polling place count and hours (despite SDR not being available on Election Day, JA44), and absentee voting (despite same-day registrants not having this option because they must vote in person during early voting, JA2; N.C. Gen. Stat. § 163-82.6B). JA84. By the district court's analysis, because North Carolina offers "extensive opportunities for voting and registration" for *other* types of voters, JA84, SB 747 cannot severely burden same-day registrants.

But *Anderson-Burdick* does not ask simply whether any other options exist. Instead, it asks about the "character and magnitude of the asserted injury." *Anderson*, 460 U.S. at 789. This requires evaluating not only "the statute's broad application to all...voters[,]" *Crawford*, 553 U.S. at 202-03, but also requires considering "the limited number of persons" for whom "the burdens that are relevant to the issue before us" will be "somewhat heavier[.]" *Id.* at 198-99; *see also Fish v. Schwab*, 957 F.3d 1105, 1127-28 (10th Cir. 2020) (holding that a challenged documentary proof of citizenship requirement imposed a significant burden based on the number of voters who were prevented from registering by it, even though the requirement applied to all voters).

When viewed in its proper *ex post* context, SB 747 imposes the most severe burden the Constitution recognizes: the outright nullification of a lawfully cast ballot. SB 747 puts same-day registrants' ballots at risk of rejection after they have already been cast based on a single misdelivered piece of mail, which does not

15

directly bear on the voter's qualifications and frequently occurs for reasons outside of the voter's control or due to errors unrelated to whether the voter lives at their residential address. JA1210-1216; *see also* JA906-915; JA926, JA949, JA964, JA1030-1031, JA1210-1213.

The right to vote is fundamental, and that right "includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29, 562 (1964); *see also Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 449 (E.D.N.C. 2025) ("[P]ost-election ballot disqualification for individuals erroneously designated as [ineligible] constitutes a substantial burden on the right to vote."); *Alcorn*, 826 F.3d at 717 (distinguishing between ballot ordering provision and one that "denies . . . the right to vote"). This burden, imposed entirely after a voter has already cast a ballot, is both substantial and qualitatively different from a burden that a voter can solve by simply choosing a different form of registration or voting. These types of *ex post* burdens also reverberate beyond one election and one ballot. Undisputed expert testimony shows that *ex post* disenfranchisement as the result of administrative errors permanently disrupts habit formation around voting and makes it less likely an impacted voter will turn out in future elections. JA1973-1974; *see also* JA623, JA931, JA946, JA984-985 (Plaintiff testimony describing importance of habit formation and lasting harms of negative voting experiences). *Cf. Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 632 (6th Cir. 2016) (holding that not counting

16

mail ballots based on voters' failure to fill out birthday and address fields with "technical precision" imposed unjustified burden).

SB 747's end result is to treat same-day registrants worse than other voters. Even after satisfying an additional documentary proof of residence requirement on top of the requirements applicable to other in-person voters, same-day registrants cannot be assured that their ballots will count, unlike any other method of voting. SB 747 imposes this risk after a voter has already cast their ballot, at which point they have *no* available alternatives for voting. In downplaying SB 747's entirely *ex post* burden by referencing other opportunities available to voters *ex ante*, the district court suggests that, before even getting to the ballot box, same-day registrants should have foreseen that their ballots would subsequently be discarded due to issues outside of their control and therefore should have used a different registration and voting method, no matter that the state held out SDR as an option. The Constitution does not permit setting such a trap in the election code, and the district court's conclusion that this burden is only minimal was erroneous.

### C.    The district court erred by failing to properly scrutinize the State's justifications for SB 747's changes to SDR.

Turning to the next step under *Anderson-Burdick*, the district court also failed to properly scrutinize the State's justifications for SB 747. This step is required

17

regardless of the severity of the burden found.[4] *Crawford*, 553 U.S. at 191 (Stevens, J., controlling op.) (quoting *Norman*, 502 U.S. at 288-89); *see also Eakin*, 149 F.4th at 314 (even when a law's burden is minimal, *Anderson-Burdick* requires determining "whether the proffered State interests justify the burden" imposed). Further "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson*, 460 U.S. at 793. As discussed *infra* Section II.C.3, SB 747 disproportionately burdens youth voters (an "identifiable political group"), making its burdens "especially difficult" to justify. *Id.*

Rather than conducting the required assessment of whether the burdens imposed by SB 747 were necessary to advance the precise interests put forth by the State, the district court merely restated them as sufficient, holding that SB 747 "serves the efficient administration of elections, aids in the prevention of fraud and the appearance of fraud, and promotes public confidence in the integrity of the electoral process." JA87. It made no attempt to identify how SB 747 serves "efficient administration of elections," JA87, which is unsurprising because SB 747 created

---

[4] The court's holding that SB 747 imposed only a minimal burden also led to cascading legal errors at this step in the analysis, as the court applied a "sliding scale [balancing analysis]: the greater the burden, the greater the justification must be." JA79 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). And of course, severe burdens require applying strict scrutiny instead. *Fusaro*, 930 F.3d at 257-58.

18

more work, as detailed by testimony from multiple county elections staff (*see* JA527-529, JA327-328, JA666-669) for no additional benefit. As for preventing fraud and promoting confidence in elections, the district court made much of the Senate having "collected 75 recommendations on election integrity from constituents and interest groups," JA88, but it did not connect those general recommendations to SB 747's changes to SDR. Nor could it; as discussed *infra* Section II.C.2, the trial record does not show constituents or election integrity groups (other than Cleta Mitchell, James Womack and NCEIT) advocating for the SDR concept that ended up in SB 747.

Because of this surface-level assessment, the district court failed to evaluate whether SB 747's new burden on same-day registrants was actually "necessary" to serve these interests in light of the pre-existing requirements for same-day registrants to prove their residency. *Anderson*, 460 U.S. at 789; *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) ("[S]tates cannot burden the right to vote in order to address dangers that are remote . . . ." (citation omitted)).

Indeed, SB 747's burdens could not be justified by these interests because these interests were already better served by the unique requirements North Carolina law already imposes on same-day registrants. Even before SB 747, same-day registrants were required to show documentary proof of their residential address at

19

the polling place, and this requirement still applies. JA17. No other type of registrant was or is required to provide such proof. JA17. This requirement was already challenging for some voters to meet, because the required documentation is not always readily available (especially for youth voters, who frequently rent in multi-unit housing or live on college campuses and may not have utility bills in their own name). *See, e.g.*, JA963-964, JA1764, JA1968-1971. But unlike SB 747's scheme, this documentary proof of address requirement constitutes a calibrated tradeoff for authorizing registration during the early voting period, allowing one-stop registration and voting only after independent, real-time verification of a registrant's address. It requires voters to affirmatively prove residence before voting while also ensuring that—unlike SB 747's new scheme—no one's fundamental right to vote is entirely conditioned on a single, error-prone verification mailing.

The documentary proof of residence requirement more directly establishes that the voter is qualified to vote—that is, that the voter is a resident of the county, at the residential address they have listed. JA13; N.C. Gen. Stat. §§ 163-55, 163-57. It provides contemporaneous affirmative evidence that the voter lives where they say they live. SB 747's mail verification change, by contrast, shows only whether the registrant can receive mail at the residential or mailing address they list. JA1211, JA1213. And Paul Cox, general counsel for the State Board, confirmed: (1) that mail verification can fail for reasons independent of whether a person lives at their

20

residential address; (2) that mail verification relies on the voter knowing exactly how to address mail to where they can receive it; and (3) that mail can be returned undeliverable even when it is addressed correctly and all proper steps are followed. JA1210-1212.

The district court held that this redundant burden was justified because SDR "requires unique considerations because it permits registration so close to election day" that "the two-card verification process, which is the state's statutory method of verification for traditional registration, faces practical limitations." JA82. But this is precisely why same-day registrants, both pre- and post-SB 747, are required to provide documentary proof of residence when registering, unlike any other registrant in North Carolina. That is the unique consideration, and one much better calibrated to the interest it serves. It is of no import that the two-card verification process cannot play out in this timeframe, because the interest it (imprecisely) serves is served instead by the documentary proof of residence requirement for same-day registrants. The State does not have a freestanding interest in utilizing a verification mailing system. The actual state interest is in confirming that a voter lives where they say they live. That interest is served by the documentary proof of residence requirement for same-day registrants, and the State is not entitled to impose an additional burden

21

on those voters that does nothing to further advance the State's interest in verifying voters' residences.[5]

Evidence from the State Board of Elections helps to show that the identified justifications for SB 747 did not make it "necessary to burden [same-day registrants'] rights." *Anderson*, 460 U.S. at 789. The State Board was not consulted about the bill before it was filed. JA1176-1177; *see also* JA33. The State Board was aware that some voters' second verification cards would be returned as undeliverable after canvass. JA1764. But despite this awareness, the State Board "had not advocated for changes to SDR because it was not concerned that there was a problem with fraudulent voting such that the SDR process needed to be changed." JA33. And the State Board "on its own . . . would not have advocated for a change to SDR." JA37; JA1187-1188. That makes sense—the documentary proof of citizenship requirement was already doing the work of proving same-day registrants' residences.

SB 747 took a carefully designed system—which balanced voters' fundamental rights against the State's interests—and added to the burdens without any additional benefit. That is an unconstitutional undue burden on the right to vote, and the district court erred as a matter of law in holding otherwise.

---

[5] The State Board's cure process expressly acknowledges this, by allowing same-day registrants who fail mail verification to prove their address by nothing more than providing more documentary proof of address. JA1888-1890.

## II.  THE DISTRICT COURT ERRED BY FAILING TO CORRECTLY APPLY *ARLINGTON HEIGHTS* TO PLAINTIFFS' TWENTY-SIXTH AMENDMENT CLAIM.

### A.  *Arlington-Heights* is the appropriate legal standard for age-based discrimination under the Twenty-Sixth Amendment.

Though the district court was "disinclined" (JA95) to attach the *Arlington Heights* framework to Plaintiffs' Twenty-Sixth Amendment claim, the plain text of the amendment, its legislative history, and case law all support its application.

The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. This language mirrors the Fifteenth and Nineteenth Amendments, which provide that voting rights "shall not be denied or abridged by the United States or by any State on account of" race, color, previous condition of servitude, or sex. U.S. Const. amends. XV, § 1, XIX. Courts have consistently recognized these parallels. *See, e.g.*, *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) ("[B]oth the Fifteenth and Nineteenth Amendments served as models for the Twenty-Sixth. . . ."); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 183-84 (5th Cir. 2020) ("The language and structure of the Twenty-Sixth Amendment mirror the Fifteenth, Nineteenth, and Twenty-Fourth Amendments. Each [] has been interpreted to provide an individual right to be free from the denial or abridgement of the right to vote based on the classification described in the Amendment.").

23

The amendment's legislative history also supports this understanding.[6] Congress initially sought to expand the franchise to 18 to 21 year-olds via statute, but that law was partially struck down by the Supreme Court in *Oregon v. Mitchell*, 400 U.S. 112 (1970). Thereafter, both houses of Congress issued a joint resolution proposing an amendment to the United States Constitution to extend the right to vote to citizens aged 18 and older. S. Rep. No. 92-26, at 1-7 (1971); H.R. Rep. No. 92-37, at 1–2 (1971). Commentary on the joint resolution from the House explicitly recognized that "the proposed new article will be construed as comparable in scope to the Fifteenth Amendment and the Nineteenth Amendment." H.R. Rep. No. 92-37, at 7 (1971); *see also* 117 Cong. Rec. 7539 (1971) (statement of Rep. Pepper) ("What we propose to do . . . is exactly what we did in . . . the 15th amendment and . . . the 19th amendment. Therefore, it seems to me that this proposed amendment is perfectly in consonance with those precedents."); *id.* at 7534 (statement of Rep. Poff) ("Just as the 15th amendment prohibits racial discrimination in voting and just as the 19th amendment prohibits sex discrimination in voting, the proposed amendment would prohibit age discrimination in voting. . .).

---

[6] Courts routinely consider legislative history to help discern the original meaning of constitutional amendments. *See, e.g.*, *United States v. IBM*, 517 U.S. 843, 859-61 (1996) (considering "substantial evidence from the [Federal Convention] that proponents of the [Export] Clause fully intended the breadth of scope that is evident in the language.")

24

Given this textual congruence and the intent of the amendment's framers, courts analyzing Twenty-Sixth Amendment claims have often looked to the more-developed jurisprudence of the Fifteenth Amendment. *See, e.g.*, *Tully v. Okeson*, 78 F.4th 377, 382 (7th Cir. 2023) (agreeing that "the Supreme Court's interpretation of the equivalent language in the Fifteenth and Twenty-Fourth Amendments is a good starting place for [the court's] analysis"); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 607 (4th Cir. 2016) ("[I]f the Twenty-Sixth Amendment functions like the Fifteenth Amendment, the plaintiffs would also need to demonstrate an <u>intent</u> to discriminate on the basis of age." (emphasis in original)). And several have applied the *Arlington Heights* framework in those cases. *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018) (describing an "emerging" "consensus" for courts applying "the *Arlington Heights* standard for Twenty-Sixth Amendment claims."); *see also One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016), *rev'd in part on other grounds*, *Luft v. Evers*, 963 F.3d 665, 673 (7th Cir. 2020) (affirming application of *Arlington Heights* to Twenty-Sixth Amendment claims).

Accordingly, the district court erred in restricting *Arlington Heights* to cases of racial discrimination. JA94. *Arlington Heights* supplies a "totality of the circumstances" framework for ferreting out hidden discriminatory purposes motivating facially neutral laws. There is simply no reason to believe that framework

25

could not equally apply when other forms of discrimination are at play. *See, e.g.,*

*Jesus Christ is the Answer Ministries, Inc. v. Balt. Cty.*, 915 F.3d 256, 263-65 (4th

Cir. 2019) (applying *Arlington Heights* to religious discrimination claim).

Accordingly, this Court should make clear that *Arlington Heights* applies to age-

based discrimination claims under the Twenty-Sixth Amendment.

**B.     The district court erred by denying that young voters are a protected class under the Twenty-Sixth Amendment.**

The Twenty-Sixth Amendment protects voters against age-based

discrimination on its face. Yet the district court applied a legal standard for age-

based discrimination that would render the Twenty-Sixth Amendment a nullity by

questioning whether "young voters," specifically "those aged 18 to 25 comprises a

cognizable class," JA46, JA90, JA107; whether using college students as a proxy for

young voters is "over- and under-inclusive," JA99; and otherwise engaging in line-

drawing related to protected class status that has no basis in the law.

The district court's analysis of young voters as a class also conflicts with well-

established principles in intentional discrimination case law. For example, that a

proxy—like college voters—may capture some voters who are not young or exclude

others who are does not bar a claim because the proxy is still "sufficiently close."

*Cf. McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) ("We have warned

that an employer cannot be permitted to use a technically neutral classification as a

proxy to evade the prohibition of intentional discrimination. An example is using

26

gray hair as a proxy for age: there are young people with gray hair (a few), but the 'fit' between age and gray hair is sufficiently close that they would form the same basis for invidious classification."). Indeed, courts considering Twenty-Sixth Amendment claims have routinely accepted "young voters" as a class in cases involving voting laws that harm college students. *See, e.g.*, *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 757 (M.D. Tenn. 2015) ("[P]laintiffs can certainly make a case that students are disproportionately younger than the average voter population and that abridging the rights of students can be a proxy for abridgement of rights on the basis of *age*." (emphasis in original)); *Detzner*, 314 F. Supp. 3d at 1222 (prohibition of on-campus early voting "is unexplainable on grounds other than age because it bears so heavily on younger voters than all other voters"); *Nichol*, 186 F. Supp. 3d at 976 n.8 ("young voters" are a sufficient class where plaintiffs' claims concerned high school and college students); *United States v. Texas*, 445 F. Supp. 1245, 1255-57 (S.D. Tex. 1978) (collecting cases), *aff'd Symm v. United States*, 439 U.S. 1105 (1979).

Nor is it dispositive that some individuals outside the protected class are impacted by the discriminatory act. "A willingness to inflict collateral damage by harming some, or even all, individuals from a favored group in order to successfully harm members of a disfavored class does not cleanse the taint of discrimination; it simply underscores the depth of the defendant's animus." *Pacific Shores Props.,*

27

*LLC v. City of Newport Beach*, 730 F.3d 1142, 1159-60 (9th Cir. 2013) (citing *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 231 (1964)).

To that end, the Court's conclusion that Dr. Grumbach's use of multiple age ranges for young voters was too "undefined," and that his ultimate definition of "young Americans" as those between 18- and 25-years-old is not "based on any articulable standard" is beside the point. JA46, JA48. Showing intentional age-based discrimination does not require some precise definition of young voters. Moreover, it is clear that voters aged 18 to 25 are younger than the rest of the electorate and Dr. Grumbach's analysis demonstrates that older elected officials target young voters' political participation due to generational polarization. *See* JA1957-1958, JA1966; JA1311. Public justifications for these actions also treat young people as a cohort, even without a defined age cut off. *See* JA1966-1967; JA1991-1992; JA1312-1313. The district court, therefore, focused too narrowly on an asserted need to precisely define young voters, without regard to the actual issue: whether the discrimination against a younger portion of the electorate is in fact age-based. A showing that the challenged provision targets young voters exclusively, or that every young voter will be disenfranchised, is not required; rather, Plaintiffs must show (as they did here) that there was an intent to discriminate based on age and that the impact of the law bears more heavily on the targeted age group.

28

C.    **The district court's application of the *Arlington Heights* framework was legally flawed.**

The district court erred in its application of the *Arlington Heights* standard in two critical ways. First, it required Plaintiffs to prove a collective legislative intent rather than that SB 747's passage was motivated in part by discriminatory intent. Then, when performing its "sensitive inquiry" into evidence of intent through the lens of its collective-intent approach, it erred by requiring Plaintiffs to prove an overriding discriminatory purpose that could be attributed to the General Assembly as a whole, ignoring or minimizing critical facts bearing on whether discriminatory purpose was—at least—one of multiple motivating factors in the passage of SB 747. Each error is addressed in turn.

1.    **The district court erred by turning the "sensitive inquiry" into discriminatory intent into a heightened requirement for collective legislative intent.**

The *Arlington Heights* framework is the well-established means for identifying where a facially neutral legislative enactment nonetheless violates a constitutional prohibition on discrimination. Its inquiry is fairly simple: "where a[n allegedly discriminatory] policy which is applied evenhandedly results in a disproportionate impact [on a protected class] and was motivated by discriminatory intent," that policy is unconstitutional. *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 879 (4th Cir. 2023) (citing *Arlington Heights*, 429 U.S. at 264-65). The framework operates by first looking at evidence under a variety of factors to

29

ascertain whether "discriminatory purpose was a motivating factor" in the challenged decision. *Arlington Heights*, 429 U.S. at 271. These factors are "not exhaustive," *Talbert v. Richmond*, 648 F.2d 925, 929 (4th Cir. 1981). The analysis instead "demands a sensitive inquiry into such circumstantial and direct evidence as may be available." *Arlington Heights*, 429 U.S. at 266. This Court has characterized this as a "totality of the circumstances analysis[.]" *McCrory*, 831 F.3d at 233.

Arlington Heights* and its progeny do not require a Plaintiff to establish "that the challenged policy 'rested solely on discriminatory purposes,' or even that 'a particular purpose was the 'dominant' or 'primary' one.'" *Coal. for TJ*, 68 F.4th at 883 (quoting *Arlington Heights*, 429 U.S. at 265). Instead, *Arlington Heights* requires an examination of all the various factors that went into a particular decision, looking for discriminatory purpose among all possible motivations. Finding it anywhere in the decision-making process is sufficient to carry Plaintiffs' burden at the first step of *Arlington Heights*. *See Arlington Heights,* 429 U.S. at 270, 270 n.21. After all, "if race"—or any other protected classification—"played a role in a decision made by a government actor, strict scrutiny applie[s]." *Louisiana v. Callais*, 146 S. Ct. 1131, 1146 (2026) (citing *Arlington Heights*, 429 U.S. at 265-66). Whether discrimination played "a role" is a much simpler, and lower, burden to carry than whether discrimination was the "sole," "predominant," or "primary"

motivation. But that is what the Supreme Court has long required from intentional discrimination plaintiffs.

Rather than look for whether discriminatory intent was a motivating purpose among many contributing purposes, the district court asked whether discriminatory intent could be "attributed to the General Assembly." JA98-99; *see also* JA39, JA101 (identifying instances where the district court pointed to the collective intent of the General Assembly and whether "the General Assembly" was or was not acting with a particular intent). This is not the standard for a discriminatory intent claim. The requirement to "attribute" an improper purpose to the General Assembly as a whole flattens the factual inquiry: instead of looking at what the different actors in the legislative process wanted or were motivated by, it shifts the focus to whether that purpose was shared widely enough to be considered the predominant, or at least a primary, motivation for the challenged enactment. *See* JA99 (holding that there was not sufficient evidence to "attribute" Mitchell and Womack's anti-youth animus to the General Assembly).

This runs afoul of *Arlington Heights'* command to evaluate *all* contributing factors in a challenged enactment, using "such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266. Discrimination playing any role in legislation is too much; the question is whether it played a role *anywhere* in the process, not whether it can be attributed to the body as a whole.

31

*Cf. Louisiana v. Callais*, 146 S. Ct. at 1146. Once discriminatory intent has been shown anywhere within the process that led to the challenged legislation, constitutional scrutiny is triggered. *Students for Fair Admissions, Inc. v. Presidents & Fellows of Harvard College*, 600 U.S. 181, 206 (2023) ("Eliminating [] discrimination means eliminating all of it.").

To frame Plaintiffs' burden, as the district court did, in terms of the intent of the General Assembly as a whole is to ask an unanswerable question. "The *only* reliable indication of [legislative] intent – the only thing we know for sure can be attributed to *all* of them – is the words of the bill that they voted to make law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 390-91 (2000) (Scalia, J., concurring) (emphasis in original). Attempting to isolate a fixed, shared legislative intent for the why of legislation is a virtually impossible task. "It is difficult or impossible for any court to determine the 'sole' or 'dominant' motivation behind the choices of a group of legislators." *Palmer v. Thompson*, 403 U.S. 217, 225 (1971). "To look for *the sole purpose* of even a single legislator is probably to look for something that does not exist." *Edwards v. Aguillard*, 482 U.S. 578, 637 (1987) (Scalia, J., dissenting) (emphasis in original). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *United States v. O'Brien*, 391 U.S. 367, 384 (1968).

32

But these cases do not overrule *Arlington Heights*, nor make it impossible to apply; instead, these cases clarify how step one of the *Arlington Heights* framework operates. The difficulty (perhaps impossibility) of establishing a collective legislative intent is precisely why *Arlington Heights* does not require a plaintiff to attribute a sole, primary, or predominant motivating purpose to an entire legislature, but instead focuses on whether "discriminatory purpose was a motivating factor" in a challenged decision. *Arlington Heights,* 429 U.S. at 265, 270.

Nor does showing discriminatory intent was a motivating factor (rather than the primary one), mean that plaintiffs will automatically win. Take it from *Arlington Heights* itself: proof of a discriminatory purpose there "would not necessarily have required invalidation of the challenged decision." *Id.* at 270 n.21. Instead, this showing simply advances the case to step two of the framework, "shift[ing] to the [legislature] the burden of establishing that the same decision would have resulted even if the impermissible purpose had not been considered." *Id.* By requiring Plaintiffs to establish a predominant legislative intent in order to show that SB 747 was motivated even in part by discriminatory intent, the district court committed legal error.

33

**2. The district court erred by disregarding the role of election integrity activists in the passage of SB 747 and ignoring clear evidence of their anti-youth animus.**

The consequences of the district court's error are twofold: first, it obscures the invidious intent present in SB 747's legislative process by aggrandizing the showing required to prove such intent was relevant, and second, it entirely fails to conduct the burden-shifting analysis step two of *Arlington Heights* requires. When *Arlington Heights* is applied correctly, Plaintiffs clearly carry their burden to show discriminatory intent was a motivating factor, and the General Assembly is unable to show that the SDR provision would have been passed without that discriminatory motivation.

This analysis begins, as always, with "the presumption of legislative good faith." *Abbott v. Perez*, 585 U.S. 579, 607 (2018). The presumption requires that reviewing courts properly allocate the *Arlington Heights* burden of proof in two respects: placing the focus on the legislature and process that led to the challenged enactment, rather than previous legislatures, *id.*, and requiring the challengers of an enactment to carry their burden before shifting that burden to the law's defenders, rather requiring the legislature to demonstrate how it "purge[d] the taint of [prior] discriminatory intent." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303-04 (4th Cir. 2020) (quotations omitted). The presumption also requires "draw[ing] the inference that cuts in the legislature's favor when confronted with

34

evidence that could plausibly support multiple conclusions." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024).

All of these precepts are respected here. Plaintiffs' affirmative case depends exclusively on evidence from the 2023 process that directly produced SB 747, not any antecedent General Assembly. Further, Plaintiffs' case makes no attempt to flip the evidentiary burden and force the General Assembly to justify itself in the first instance. Finally, Plaintiffs' case depends on nothing more than taking legislators at their word. By Defendants' own account, the bill drafters, *inter alia*, met with Mitchell, Womack and NCEIT to discuss ideas for SB 747, directly incorporated bill text drafted by them into various versions of the law, and sourced the idea to limit SDR from those third parties too. As shown below, the evidence cannot plausibly support any other conclusion, and Plaintiffs' case flows from those concessions.

If discriminatory intent is shown, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" such discrimination. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020). At this point, "judicial deference to the legislature 'is no longer justified,'" *Raymond*, 981 F.3d at 303 (quoting *Arlington Heights*, 429 U.S. at 265-66), and the court must "scrutinize the legislature's actual non-[discriminatory] motivations to determine whether they alone can justify the legislature's choices." *McCrory*, 831 F.3d at 221 (emphasis in original). Stated

35

differently, the inquiry then becomes whether discriminatory purpose "constituted a but-for cause" of the law's enactment. *Id.* at 228.

The district court directly acknowledged that legislators were responsive to concerns originating with non-legislators, most notably from election integrity activists Cleta Mitchell and James Womack. The district court's discussion of the sequence of events preceding passage (JA27-39) makes critical findings about the degree of influence that these activists had in the legislative process, and the role they played in both introducing changes to SDR and advancing the specific bill text that appeared in SB 747 at filing on June 1, 2023, which treated SDR ballots as provisional. *See generally* JA996-999, JA1002-1008, JA1135-1139 (testimony from legislative process); JA1790-1860, JA1922-1936, JA1942-1953 (documents from legislative process).

The efficacy of this advocacy campaign is undisputed. Of note, in April 2023, House members, including Rep. Mills, ran multiple bills utilizing legislative text that was "nearly identical to that of NCEIT's proposed bills," (JA30; *see also* JA1086-1092, JA1140, JA1910-1921, JA1925-1927, JA1942-1953), and even ran a standalone bill earlier in legislative session that would make SDR ballots provisional. JA29-30; *see also* JA1092, JA1094-1095. That House Bill closely tracked the language of the SDR provision that later appeared in the filed version of SB 747. JA1137-1140, JA1142-1147 (Womack acknowledging authorship of

36

legislative proposals, including SDR language); JA1086-1095 (Rep. Mills acknowledging he sponsored multiple bills that were almost identical to NCEIT drafts and recognizing the SDR provision in the filed SB 747 as "substantially similar" to a bill he sponsored, HB 485); JA29 (quoting Rep. Mills as acknowledging they were "substantially similar, very well could be the same."); JA1086-1088; *compare* JA1755 *with* JA1908-1909. Then on May 24, 2023, Mitchell and Womack met privately with Senator Daniel and the other Senate election chairs[7] to discuss their legislative priorities. JA30, JA1003, JA1151.[8] Though the Court acknowledged that the legislative process included outreach and advocacy from other third party groups (JA27),[9] this was the only instance in the entire trial record of an in-person meeting between election integrity groups and primary legislative decisionmakers convened to negotiate the contents of the yet-be-released omnibus election bill. A

---

[7] According to Senator Daniel, the election chairs sponsor and handle all election legislation: they choose what changes to make, what "concept[s]" to adopt, and hand it to staff bill drafters to prepare. JA994.

[8] Mitchell forecasted a meeting of this sort just weeks earlier while attending the April 15, 2023 Republican National Committee donor retreat. While leading a presentation entitled "A Level Playing Field for 2024" she stated "[w]e can fix a few things in North Carolina because . . . we now have a legislature controlled by Republicans . . . ." JA24, JA770.

[9] When asked on the stand, Senator Daniel could only identify one other third-party who he claimed gave recommendations for SB 747 and only after prompting from his attorney. JA1037. Even so, Senator Daniel did not testify that this individual— Major Dave Getz—raised concerns about SDR.

37

PowerPoint presentation from that meeting identified "Same Day Registration (SDR) during early voting" as an "Election Integrity Challenge[]" and asserted that "out of state college student registration to vote in NC remains problematic." JA1840-1842. On the "Recommendation" slides, Mitchell and Womack advocated for "[e]liminat[ing] same-day registrations (SDRs) during early voting- or at least requir[ing] SDRs be issued provisional ballots so that addresses can be verified and challenges permitted prior to canvass." JA1851. A contemporaneously written recap email sent by Womack to Senate drafters the evening of the meeting documented "the features we discussed" and that Womack and Mitchell "would like to see [] prioritized in the upcoming Omnibus bill," which included treating SDR votes as provisional. JA31, JA1859.

One week later, on June 1, 2023, SB 747 was filed with a provision that would require provisional ballots for SDR, JA32, the very policy change requested by NCEIT for inclusion in the omnibus elections bill. Senator Daniel acknowledged under oath that the SDR provision was an NCEIT legislative priority. JA1005-1006. And NCEIT claimed credit for some of the "meritorious changes" in the filed bill in on-the-record statements with press. JA32-33, JA1158-1160, JA2111-2113.

The one plausible factual inference to be drawn from this sequence is that SB 747 included restrictions to SDR because Mitchell and Womack requested them. Indeed, Defendants have advanced no alternative source for this idea and admit that

38

SB 747's SDR proposal was among the proposed bill text submitted by NCEIT that found its way almost verbatim into legislative proposals filed by the General Assembly. JA29-30.

But why did Mitchell and Womack seek changes to same-day registration? Their motivation is also clear from the record.

Mitchell is a prominent figure in conservative circles on issues of election integrity and elections generally. JA21-22, JA24. Mitchell stated that the participation of college student voters can cause elections to be "unfair" and "manipulated" and explained at length her belief that "Democratic operatives decided over a decade ago to focus on trying to make it easier for college students, not just 18-year-olds, not just 19-year-olds, but college students . . . because they were largely Democrat voters . . . So they made changes in the laws to make it easier for that subgroup so that they could help impact the outcome of the election." JA22, JA780-781; *see also* JA734-736, JA740-742 (confirming belief that "the Democratic Party's strategy [was] to support same-day registration and put polling places on campuses. . . . so college students can just roll out of bed, vote, and get back into bed"). According to Mitchell, it "make[s] it easy [to cheat] when you have the polling locations where [students] live on the campus; you have [SDR]; you can use student IDs. You create a continuum where you're just breaking little bones all along the arm. Pretty soon you've got a broken arm." JA780-781.

Womack testified similarly about his perception that students received unfair favoritism under NC election laws, which he believed should be rectified. He believed "that [same-day registration] created a special class of voters and a disparate treatment of normal registrants" JA1156,[10] and that "we bend over backwards to make sure college students can vote in North Carolina," despite them not being "vulnerable voters" in his view. JA1127. Womack also contended that college students use any address they can to register and vote and that "students take advantage of that weak and permissive definition to register to vote in North Carolina," creating a "vulnerability for election fraud." JA1130-1131. He questioned the validity of college students from out of state voting in NC elections because they "are going to go home to mommy and daddy, and they're going to go somewhere else to go into employment." JA1131-1132. He believed these students should be "voting in their home states" and saw it as something "we need to fix." JA1132-1133. Finally he spoke pejoratively about young voters who "tend to be like social butterflies," with an "attention span [that] is focused on other things until just before the election, when, all of a sudden, they're motivated to get registered right in this moment," particularly by "their beer-drinking buddies or college student friends." JA1129.

---

[10] As noted *supra* Section I.A, this distinction between same-day registrants and "normal" or "traditional" registrants is not one recognized in NC election law.

40

In sum, Mitchell and Womack perceived college voters as receiving undeserved advantages in the election code that needed to be eliminated, and used what notoriety and influence they had amongst the General Assembly to "fix" the problem. But, targeting a protected class, even if to "preserve legislative power in a partisan manner[,] can also be impermissibly discriminatory." *Veasey v. Abbott*, 830 F.3d 216, 241 n.30 (5th Cir. 2016) (en banc); *accord McCrory*, 831 F.3d at 226 ("When a legislature dominated by one party has dismantled barriers to African American access to the franchise, even if done to gain votes, 'politics as usual' does not allow a legislature dominated by the other party to re-erect those barriers.").

The district court committed error by discounting the motivations of Mitchell and Womack, writing them off as no more than "personally held criticisms of how *college* voting was conducted in the state . . . irrespective of age," JA38-39 (emphasis added). *Contra McCrory*, 831 F.3d at 226 ("in what comes as close to a smoking gun as we are likely to see in modern times, the State's very justification for a challenged statute hinges explicitly on race -- specifically its concern that African Americans, who had overwhelmingly voted for Democrats, had too much access to the franchise." (emphasis in original)).

All told, the clear record from the sequence of events demonstrates a successful influence campaign driven by Mitchell and Womack to restrict SDR because, in their eyes, it provided youth and college students with "too much access

41

to the franchise." *McCrory*, 831 F.3d at 226. But the district court resisted that obvious inference, holding instead that Mitchell and Womack's inability to compel the inclusion of the most extreme version of its preferred legislative policy – the outright elimination of same-day registration – into the filed or final versions of SB 747 conclusively proved that they had not influenced the law. *See generally* JA39, JA100-101. The district court went so far as to hold that "even if Mitchell and Womack disliked young voters and sought to target them specifically," and "even if [legislators were] spurred in part by the efforts of Mitchell and Womack," Plaintiffs had still "not introduced sufficient evidence" of discriminatory intent to carry their burden at step one of *Arlington Heights*. JA99. In other words, the district court held that even if discriminatory intent were a motivating factor in SB 747, the law nonetheless could not be discriminatory because Plaintiffs had not shown that discrimination was the overriding purpose of the legislation.

This was error. It is well-established that a government actor "may not avoid the strictures" of the Constitution simply "by deferring to the wishes or objections of some fraction of the body politic." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). Plaintiffs "need not prove that the [General Assembly] itself intended to discriminate[.]" *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1225 (2d. Cir. 1987). "It is sufficient that "animus was a significant factor in the position taken by the persons to whose position the official decision-maker [was]

42

knowingly responsive." *Id.* at 1226; *see also Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1007-08 (11th Cir. 2018) ("those who played a primary role in lobbying for [challenged legislation] translated their grassroots effort into official action.") (internal quotation omitted); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982). The district court impermissibly constrained the relevant universe from contributing factors to primary purpose in the framing and passage of SB 747, and hamstrung the "sensitive inquiry" called for by *Arlington Heights* accordingly.

Moreover, the wholesale elimination of SDR is not the correct litmus test for whether Mitchell and Womack successfully lobbied the legislature. Mitchell and Womack were the source of the idea to change SDR in SB 747, and they were motivated, at least in part, to do so by a desire to disadvantage young voters. This carries Plaintiffs' burden at step one of *Arlington Heights*. The inquiry then turns to step two: can Defendants show that SB 747's changes to SDR would have been enacted without the discriminatory intent of Mitchell and Womack? The record shows that they cannot, for a simple reason: SDR would not have changed at all without their involvement.

As the district court noted, Womack learned early in his discussions with the bill sponsors that "wholesale elimination" of SDR was "mission impossible" because of prior lawsuits, JA780, JA1138-1140. With that understanding, Womack

43

and Mitchell shifted their advocacy, seeking other ways to limit SDR. JA28 (noting that NCEIT's suggestion to treat SDR ballots as provisional was a "second-best recommendation"); *see also* JA1138-1139 (describing the meeting with the election chairs as a "negotiation about our wish list"). They were successful in that effort. *Accord Mi Familia Vota v. Fontes*, 129 F.4th 691, 727-28 (9th Cir. 2025) (involvement of third-party that expressed discriminatory intent in advocating for voting changes "support[ed] a conclusion that the Voting Laws were the product of intentional discrimination" where the lobbyists helped author the bill, sent legislators materials, and were credited by legislators for the bill's text). Curiously, the district court held that *Mi Familia Vota* "does not help Plaintiffs." JA100. But the district court brushed past the similarities between Mitchell and Womack here and the involvement of the third-party activists in that case, deviating again from the simple question of whether discriminatory intent was a motivating factor behind SB 747. *See* JA100 (asserting that legislators exercised independent, cleansing judgment "even if" SB 747 was "spurred in part by the efforts of Mitchell and Womack").

Nor does the mere involvement of outside parties render this case analogous to the cat's paw theory rejected in *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021). The district court below held that this case was "much like *Brnovich*" because Plaintiffs sought "to impute the intent and motivations of Mitchell and Womack" to the General Assembly. JA103. Setting aside that this is

44

not Plaintiffs' burden, the present case does not rely whatsoever on a cat's paw theory. In *Brnovich*, the Supreme Court rejected the implication that a legislature could be "dupe[d]" into unwittingly doing the bidding of an outside actor. 594 U.S. at 689-90. That is the opposite of what happened here. Here, Mitchell and Womack did not surreptitiously infiltrate the legislative process, they were invited into it. They proposed concepts and drafted bill language, including the idea for modifying SDR in the first place. No party contends that the General Assembly was duped into anything—indeed, to do so would be "insulting[.]" *Id.* at 690.

Nor does the State Board's late-stage intervention to make the new restrictions on SDR more administrable (*see* JA33-37, JA1177-1178) provide an independent source for the SDR changes sufficient to negate the but-for cause of discriminatory intent. Paul Cox, the State Board General Counsel, testified that the State Board would not have independently advocated for a change to SDR (JA37, JA1180-1181) and only learned of the change after the bill was filed. JA1176-1177. The State Board only made the recommendation to switch to a one-mailer verification system (rather than the provisional ballot approach) based on its understanding that changes to the SDR process would remain in the bill no matter what. JA1185-1188; *see also* JA1782-1784. The State Board did not push for changes to SDR, did not consider them necessary, and engaged in the legislative process only after Mitchell and

45

Womack successfully transformed the restriction of SDR into a non-negotiable feature of SB 747. JA1186-1188.

The district court committed legal error in disregarding the discriminatory intent of Mitchell and Womack, and in failing to shift the burden to SB 747's defenders to show that the SDR restrictions would still have been enacted but-for the actions of Mitchell and Womack. When the burdens are properly allocated and shifted, as *Arlington Heights* and its progeny require, it is clear that an intent to discriminate against young voters was a but-for cause of SB 747.

### 3. The district court did not properly assess the disproportionate burden that SB 747 imposes on youth voters.

The record shows that, relative to their share of the electorate, youth voters have disproportionately used SDR compared to other voters and similarly have disproportionately relied on the second mailer of the pre-SB 747 verification scheme to successfully register, which SB 747 removed.[11] Between 2014 and 2024, youth

---

[11] Though the district court found Defendants' expert Dr. Paul White's analysis "to be more reliable" than Plaintiffs' expert Dr. Kevin Quinn, JA65, that finding does not foreclose relief for Plaintiffs. The district court still premised many of its findings and conclusions utilizing the figures from Dr. Quinn, including the historical registration and voting data from his Opening Report (JA2004-2030), the 2024 notice-and-cure analysis from his Opening Report (JA2043-2055), and the empirics of the two-mailer verification in his Supplemental Report (JA2079-2092). This brief does the same.

Even then, the district court's critique of Dr. Quinn's supposed "programming errors" (JA65) are unsupported by the record.

46

voters accounted for between 12% and 14% of the electorate depending on the year, *see* JA2017-2018, while simultaneously making up roughly 30 to 40% of the voters who utilized SDR. JA2023-2025 (showing that youth voters ranged from 27.23% of SDR voters to 41.49% of SDR voters between 2016 and 2024). Youth voters were also sent 48.3% of second verification cards across all modes of registration from 2010 to 2025 (again, despite their relatively small share of the electorate). *See* JA72 (finding that at most, 76,429 youth voters received a second mail verification card out of, at most, 158,163 total voters); JA2080-2085 (showing Dr. Quinn's analysis); *see also* JA2230 (showing the same trend in Dr. White's analysis).

---

*First*, Dr. Quinn explained both in his supplemental report (JA2076-2078) and in his trial testimony that the supplement relied on sworn testimony from State Board staff regarding the two-mailer verification system and the State Board programming codes that correspond to those processes, which later proved to be incorrect. JA808-812; *see* JA1516 (Dr. White: "Dr. Quinn and I both had to rely on [the same] data.").

*Second*, Dr. White's analysis is replete with the same sorts of line-drawing problems the district court faulted Dr. Quinn for. *Compare* JA65-69 (documenting choices by Dr. Quinn) *with* JA1522-1538 (documenting choices by Dr. White). Dr. White also employed a methodology, used primarily in his labor economics work, that the Supreme Court has specifically rejected as probative in voting analyses. JA1519-1522; *see also Brnovich*, 594 U.S. at 673 ("We also do not find the disparate-impact model employed in Title VII and Fair Housing Act cases [and Dr. White's analysis] useful here.").

*Finally*, and most important, as Dr. Quinn explained, "even if you [prefer] Dr. White's preferred way of analyzing the data and you ask the right question, you end up with the same answer, essentially[.]" JA835-836 (illustrating that Drs. White and Quinn both come to substantially similar numbers of voters impacted by SB 747's changes).

47

The conclusion to be drawn is simple: young voters are disproportionately likely to be same-day registrants, and disproportionately likely to need the second mailer to successfully verify. This means they are double exposed to SB 747's changes, both because of the method of voting targeted (SDR) and the mechanism used by the new restrictions (eliminating the second verification mailer).

Data from the 2024 General Election highlights the disproportionate harm to youth voters caused by SB 747 where the second verification mailer was eliminated, then replaced by court order, with a new notice-and-cure process. Youth voters made up 13.36% of the electorate in the 2024 General Election, JA2018, and accounted for approximately 9.53% of early votes cast, s*ee* JA2021-2022 (dividing 401,801 youth votes by 4,217,929 total early votes). Though constituting a small proportion of overall voters and early vote ballots cast, youth voters cast 32.24% of SDR votes. *See* JA2025. And youth voters made up an *even larger* proportion of voters who failed the first mailer and were funneled into the notice-and-cure process in that election: 40.4%. *See* JA2047-2048 (comparing the sum of voters under 26 who are in the "Denied – Default Time Limit", "Denied – Failed Cure", "Started New Mailing", and "Verified – SDR Cure" categories to the sum of the "Total" row for those categories). Once in the notice-and-cure process, 465 youth voters had their ballots rejected in the 2024 General Election compared to just 656 ballots for all voters 26 and older (JA2047; *see also* JA68), accounting for 41.5% of discarded

48

ballots despite young voters only accounting for 13.36% of the electorate in that election. JA2018. In sum, the evidence showed that relative to other age groups, youth voters were more likely to use SDR, more likely to fail mail verification, and once in the notice-and-cure process, more likely to have their ballot rejected.

Despite this record, the district court held that Plaintiffs had failed to demonstrate disproportionate burden on youth voters. It identified "two independently dispositive reasons:" (1) because the evidence failed to show that SB 747, considered with the notice-and-cure process, "leaves young voters worse off than did the pre-SB 747 scheme;" and (2) because "only insubstantial numbers" of voters were actually affected by the change. JA67. Both reasons rely on a view of disparate impact at odds with clear precedent in this Court.

*First*, the district court erred by focusing its disparate impact analysis on youth electoral outcomes pre- and post- SB 747 enactment without reference to how other age-groups fared under both schemes. In this regard, the court treated as dispositive that youth voters failed mail verification at similar rates under both schemes, and that youth voter turnout increased after the passage of SB 747. *See* JA103-04. This was error. The pivotal question when evaluating disproportionate impact is whether the policy at issue "bears more heavily on one [group] than another." *McCrory*, 831 F.3d 204, 230 (quoting *Arlington Heights*, 429 U.S. at 266 (1977)); *Coal. for TJ*, 68 F.4th at 880. Answering that question necessarily requires a comparison between

49

different groups under the challenged policy. *Coal. for TJ*, 68 F.4th at 80 ("[A]n assessment of the attainments of one group in isolation will not answer the question of whether a challenged policy "'bears more heavily on one race than another'" (emphasis in original)); *see also id*. at 881 ("Put most simply, searching for a [] 'disproportionate' impact necessitates a relative inquiry among [] groups, not a simple appraisal of one group's performance over time.").

By focusing on year-to-year denial rates and turnout solely within the impacted population, the district court flouted this guidance, repeating the mistakes of other lower courts assessing disparate impact. In *McCrory*, for example, the Fourth Circuit explicitly rejected a proof requirement that the challenged election law "prevented African Americans from voting at the same levels they had in the past." 831 F.3d at 232 ("Emblematic of this error is the almost dispositive weight the court gave to the fact that African American aggregate turnout increased by 1.8% in the 2014 midterm election as compared to the 2010 midterm election."). Then in *Coal. for TJ*, a school admissions case, this Court rejected the lower court's application of a "strictly temporal method for assessing racially disparate impact" that focused on outcomes within a single group "prior to and following the policy's adoption." *Coal. for TJ*, 68 F.4th at 880-81. The Court explained that the performance of the impacted group under a prior policy is not the correct starting place for a disproportionate impact analysis; instead, "the proper metric in these

50

circumstances" requires an evaluation of the impacted group's "rate of success" navigating the new policy compared to how other groups fared doing the same. *See Coal. for TJ.*, 68 F.4th at 881-82; *see also McCrory*, 831 F.3d at 231, 233. This is consistent with how other circuits have approached disparate impact analyses in other contexts. *See Coal. for TJ.*, 68 F.4th at 880 (citing sister circuit decisions disapproving "before-and-after approache[s] to disparate impact"). For the instant case then, the proper inquiry is whether the SB 747 policy change resulted in youth voters facing a disproportionate, negative impact relative to other voters, which, as noted above, is precisely what Plaintiffs' evidence established.

*Second*, the district court also erred by placing undue weight on the magnitude of the impact experienced by youth voters, despite the evidence showing the existence of a disproportionate impact. As the Court explained in *McCrory*, "[s]howing disproportionate impact, even if not overwhelming impact, suffices to establish <u>one</u> of the circumstances evidencing discriminatory intent." *McCrory,* 831 F.3d at 231. Thus, focusing on the proportion of North Carolina's voting framework implicated by the changes to SB 747, *see* JA71-72, JA104, rather than on the ways in which the change created a disproportionate impact on youth voters was error.

While this error alone would be grounds for reversal, the district court compounded it in two noteworthy ways, both of which had the effect of understating the impact of the law and heightening Plaintiffs' burden of proof.

51

First, it sought to excuse or discount the burden on voting imposed by SB 747 by looking to the existence of other options for voting. *See, e.g.*, JA70-72 (discussing the proportion of "SDR voting" in a general election compared to overall votes cast and the degree to which this implicates "a miniscule portion of North Carolina's voting framework"). But the Fourth Circuit explicitly disclaimed such an approach in *McCrory*, when it rebuked the lower court for weighing the "disproportionate impact of the new legislation," which included removed voting mechanisms and disparate voter ID possession, against "the options remaining after enactment." 831 F.3d at 230. On this point, *Arlington Heights* itself is instructive, since the plaintiffs there did not have to show that "the Chicago area as a whole lacked low-income housing or that the plaintiffs had no other housing options. Instead, it was sufficient that the zoning decision excluded them from a particular area." *McCrory*, 831 F.3d at 230 (citing *Arlington Heights*, 429 U.S. at 260, 265-66, 269).[12]

Second, the district court consistently assessed potential impact from the perspective of registration outcomes, rather than voting outcomes. JA103-104 (noting, for example, "that before SB 747, young voters were unlikely to successfully register on the second verification card; most failed, and only a small number succeeded"). But this focus misses the true harm of SB 747, which

---

[12] Further, this conception of burden entirely ignores the impacts being disqualified by an administrative error will have not just in one election, but by permanently depressing turnout in future elections. JA1973-1974.

heightened the consequence of the first mail verification card. Under SB 747, a failure to subsequently verify through the new notice-and-cure process guarantees that a ballot will be rejected, whereas a failure to successfully register on the second verification card under the old regime required no such thing. The prior regime ensured more expansive protections for registrants who failed a first mailing than what SB 747 same-day registrants now receive. Those registrants could have both verification mailings returned undeliverable before canvass but still have their ballot counted. N.C. Gen. Stat. § 163-82.7(g); JA1199-1203. And even if those ballots were challenged by elections staff, removing their ballot from the count would require affirmative proof of ineligibility. N.C. Gen. Stat. §§ 163-89, 163-90.1(b); JA1204-1205. The new regime flips that burden to the voter to provide additional evidence of their residency, and defaults to discounting an impacted voter's ballot, rather than requiring additional affirmative steps before any ballot is removed. JA18-20; JA1895-1907.

The district court also makes much of the notice-and-cure process required by its preliminary injunction order. JA103-04. But the record reflects that notice-and-cure is an incomplete solution at best. In the same way that most voters failed the second mailer pre-SB 747, most voters will fail notice and cure post-SB 747. *See* JA66-67, JA2081 (finding that "at least 72%" of both traditional and SDR registrants receiving the second mailer under the pre-SB 747 regime failed to successfully

register); JA2047-2048 (showing that approximately 72%[13] of voters funneled into the SB 747 notice-and-cure process had their ballots rejected). Unlike pre-SB 747, however, when voters who failed a first and second mailer had many procedural safeguards before their ballot could be discounted, all same-day registrants who fail even one mailer under SB 747 will have their ballots discarded unless they take affirmative steps to stop it, regardless of what it says about their eligibility or whether they even received notice that there was a problem. This shift places an extraordinary amount of weight on a single, error-prone verification mailing. That mailing cannot bear the weight SB 747 places on it.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court: (1) reverse the district court's order on the grounds that SB 747 imposes an undue burden on the right to vote in violation of the First and Fourteenth Amendments and was enacted with discriminatory intent in violation of the Twenty-Sixth Amendment; and (2) restore same-day registration to its pre-SB 747 state.

---

[13] Calculated from the sum of all denied SDR ballots that entered the notice and cure process (945+176) divided by the total number of all ballots that entered the notice and cure process (945+176+172+258), which equals 72.28%. JA2047-2048.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument pursuant to Federal Rule of Appellate Procedure 34 and Local Rule 34(a). This appeal involves important constitutional issues in an area of significant public interest: the fundamental right to vote. Plaintiffs believe that oral argument will aid this Court's review and disposition of the issues presented.

Respectfully submitted,

/s/ Jeffrey Loperfido
Jeffrey Loperfido
Christopher Shenton
Adrianne M. Spoto
Hilary H. Klein
Helena Abbott
Lily Talerman
SOUTHERN COALITION FOR
SOCIAL JUSTICE
PO BOX 51280
Durham, NC 27717
919-794-4213
jeffloperfido@scsj.org
chrisshenton@scsj.org
adrianne@scsj.org
hilaryhklein@scsj.org
helena@scsj.org
lily@scsj.org

55

Michael Dockterman
Laurel Taylor
Kristin Hendriksen
MCDERMOTT WILL &
SCHULTE LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
312-984-7730
mdockterman@mcdermottlaw.com
ltaylor@mcdermottlaw.com
khendriksen@mcdermottlaw.com

Rachel Cannon
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
312-577-1270
rcannon@steptoe.com

Michelle Kallen
Laura Niday
STEPTOE LLP
1330 Connecticut Ave NW
STE Office 785
Washington, DC 20036
202-429-6415
Mkallen@steptoe.com
Lniday@steptoe.com

*Attorneys for Plaintiffs-Appellants*

56

**CERTIFICATE OF COMPLIANCE**
**WITH TYPEFACE AND WORD COUNT LIMITATIONS**

I, Jeffrey Loperfido, counsel for Plaintiffs-Appellants and a member of the Bar of this Court, certify that the attached Opening Brief is proportionately spaced, has a typeface of 14 points using Times New Roman font, and contains 12,927 words as calculated pursuant to Fed. R. App. Proc. 32(f).

/s/ Jeffrey Loperfido

*Attorney for Plaintiffs-Appellants*

June 9, 2026