No. 26-1532

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

DEMOCRACY NORTH CAROLINA, et al.,

*Plaintiffs-Appellants*,

v.

FRANCIS X. DE LUCA, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS, et al.,

*Defendants-Appellees*,

and

PHILIP BERGER, in his official capacity as PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE, et al.,

*Intervenors-Appellees*.

From the United States District Court
For the Middle District of North Carolina
The Honorable Thomas D. Schroeder (No. 1:23-cv-878)

**Response Brief of Intervenor Legislative Defendants-Appellees &
North Carolina State Board of Elections Defendants-Appellees**

(counsel listed on reverse)

Phillip J. Strach
Alyssa M. Riggins
Cassie A. Holt
Jordan A. Koonts
Kacie T. England
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
301 Hillsborough St., Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com
kacie.england@nelsonmullins.com

*Counsel for Legislative Defendants-Appellees*

Mary L. Lucasse
Mary W. Scruggs
Special Deputy Attorneys General
**NC DEPARTMENT OF JUSTICE**
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6400
mlucasse@ncdoj.gov
mscruggs@ncdoj.gov

*Counsel for State Board of Elections, Defendants-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1532 Caption: Democracy North Carolina, et al. v. Francis De Luca, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Legislative Defendants Philip Berger, in his official capacity, and Destin Hall, in his official capacity
(name of party/amicus)

who is appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Phillip J. Strach Date: 05/01/2026

Counsel for: Legislative Defendants



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1532 Caption: Dem, NC, et al. v. North Carolina State Board of Elections, et. al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Francis X. De Luca, Jeff Carmon, Stacy Eggers, IV, Angela Hawkins, Siobhan O'Duffy Millen and
(name of party/amicus)

Sam M. Hayes, all in their official capacities, and the N.C. State Board of Elections

who is State Board Defendants-Appellees, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Mary L. Lucasse Date: 5/8/26

Counsel for: State Board Defendants-Appellees



Print to PDF for Filing

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

STATEMENT OF THE ISSUE .......... 3

STATEMENT OF THE CASE .......... 3

I. North Carolina Makes Registering to Vote Easy and Accessible For All Qualified Persons .......... 3

II. There is No New "Harm" Under SB 747. .......... 6

III. SB 747's Origins Embody the Ideal Legislative Process .......... 7

IV. The UMP Serves Well-Settled Governmental Interests .......... 12

V. The UMP Lacks Any Discriminatory Motive, Intent, or Impact .......... 15

VI. Plaintiffs Bring Suit and Lose at Trial .......... 18

SUMMARY OF THE ARGUMENT .......... 20

STANDARD OF REVIEW .......... 21

ARGUMENT .......... 21

I. The District Court Correctly Rejected Plaintiffs' Undue Burden Claim .......... 21

A. The District Court Correctly Assessed the UMP's Burden Within North Carolina's Whole Electoral System .......... 23

B. The District Court Did Not Create New or Improper Voter Classifications .......... 26

C. The District Court Rightly Found the UMP Is Not a Severe Burden on Voting Rights .......... 28

i. Precedent Forecloses Plaintiffs' Severity Arguments .......... 30

ii. The District Court Properly Balanced the UMP's Minimal Burden Against the State's Well-Settled Interests ........................................ 33

II. The District Court Correctly Found Plaintiffs' Twenty-Sixth Amendment Claim Fails Under Either *Anderson-Burdick* or *Arlington Heights* ........................................................ 35

A. *Anderson-Burdick* Is the Correct Framework for Twenty-Sixth Amendment Claims......................................... 35

B. The District Court Properly Rejected Plaintiffs' Twenty-Sixth Amendment Claim Under *Arlington Heights*.......... 40

i. Plaintiffs Cannot Define a Cognizable Voter Class ........................................................... 40

ii. The District Court Faithfully Applied Every *Arlington Heights* Factor ....................................... 43

iii. Even if Plaintiffs Demonstrated the *Arlington Heights* Factors, SB 747 Would Have Been Enacted Regardless............................................. 59

CONCLUSION........................................................................ 60

CERTIFICATE OF COMPLIANCE ...................................................... 62

CERTIFICATE OF SERVICE ......................................................... 63

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott v. Perez*,
585 U.S. 579 (2018)....................52

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024)....................49, 53

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)....................21, 22, 28

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)....................*passim*

*Arizona Libertarian Party v. Hobbs*,
925 F.3d 1085 (9th Cir. 2019)....................27

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021)....................*passim*

*Burdick v. Takushi*,
504 U.S. 428 (1992)....................21

*Buscemi v. Bell*,
964 F.3d 252 (4th Cir. 2020)....................27, 28, 33

*Chavez-Deremer v. Med. Staffing of Am.*,
LLC, 147 F.4th 371 (4th Cir. 2025)....................3

*Clingman v. Beaver*,
544 U.S. 581 (2005)....................28

*Coal. For TJ v. Fairfax Cnty. Sch. Bd.*,
68 F.4th 864 (4th Cir. 2023)....................57

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008)....................*passim*

*Farm Lab. Org. Comm. v. Stein*,
56 F.4th 339 (4th Cir. 2022)....................36

*Feldman v. Arizona Sec'y of State's Office*,
208 F. Supp. 3d 1074 (D. Ariz. 2016), *aff'd*, 9 F.4th 1218 (9th Cir. 2021) ....30

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) ....29, 32

*Grayson O Co. v. Agadir Int''l LLC*,
856 F.3d 307 (4th Cir. 2017) ....39, 44

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) ....29, 31

*Griffin v. N.C. State Bd. of Elections*,
781 F. Supp. 3d 411 (E.D.N.C. 2025) ....32

*Harper v. Hall*,
886 S.E.2d 393 (N.C. 2023)....8

*Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County, Maryland*,
915 F.3d 256 (4th Cir. 2019) ....36, 37

*Kimel v. Florida Bd. of Regents*,
528 U.S. 62 (2000)....36

*League of Women Voters of Fla., Inc. v. Detzner*,
314 F. Supp. 3d 1205 (N.D. Fla. 2018) ....39, 42

*Lee v. Va. State Bd. of Elections*,
843 F.3d 592 (4th Cir. 2016) ....*passim*

*Levy v. Lexington Cnty.*,
589 F.3d 708 (4th Cir. 2009) ....21

*Libertarian Party of Virginia v. Alcorn*,
826 F.3d 708 (4th Cir. 2016) ....23, 28, 30

*Louisiana v. Callais*,
146 S.Ct. 1131 (2026)....44, 49

*Luft v. Evers*,
963 F.3d 665 (7th Cir. 2020) ....25, 39

*Mazo v. New Jersey Sec'y of State*,
54 F.4th 124 (3d Cir. 2022) ....................................................................23, 25

*McBurney v. Young*,
667 F.3d 454 (4th Cir. 2012), *aff'd*, 569 U.S. 221 (2013) .................................18

*McDonald v. Bd. of Election Comm'rs of Chicago*,
394 U.S. 802 (1969)...........................................................................................22

*McGowan v. Maryland*,
366 U.S. 420 (1961)...........................................................................................33

*McLaughlin v. N. Carolina Bd. of Elections*,
65 F.3d 1215 (4th Cir. 1995) ....................................................................27, 28

*McWright v. Alexander*,
982 F.2d 222 (7th Cir. 1992) ............................................................................42

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ....................................................................53, 54

*N. Carolina State Conf. of the NAACP v. Raymond*,
981 F.3d 295 (4th Cir. 2020) .......................................................................*passim*

*N.C. State Conf. of the NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ....................................................................57, 58

*Nashville Student Org. Comm. v. Hargett*,
155 F. Supp. 3d 749 (M.D. Tenn. 2015) ...........................................................42

*Ne. Ohio Coal. for the Homeless v. Husted*,
837 F.3d 612 (6th Cir. 2016) ............................................................................26

*Nelson v. Warner*,
12 F.4th 376 (4th Cir. 2021) .............................................................................33

*One Wis. Inst., Inc. v. Thomsen*,
198 F. Supp. 3d 896 (W.D. Wis. 2016), *rev'd in part on other grounds*, *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020).........................................39

*One Wisconsin Inst., Inc. v. Nichol*,
186 F. Supp. 3d 958 (W.D. Wis. 2016)............................................................42

*Pisano v. Strach*,
743 F.3d 927 (4th Cir. 2014) ....................22, 33, 58

*Pullman-Standard v. Swint*,
456 U.S. 273 (1982)....................3

*Richardson v. Texas Sec'y of State*,
978 F.3d 220 (5th Cir. 2020) ....................23, 29

*S.C. Green Party v. S.C. State Election Comm'n*,
612 F.3d 752 (4th Cir. 2010) ....................33

*State v. Berger*,
781 S.E.2d 248 (N.C. 2016)....................8

*Tennessee Conference of Nat'l Ass'n for the Advancement of Colored People v. Lee*,
139 F.4th 557 (6th Cir. 2025) ....................26

*Texas Democratic Party v. Abbott*,
978 F.3d 168 (5th Cir. 2020) ....................35

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997)....................31, 32

*Tully v. Okeson*,
78 F.4th 377 (7th Cir. 2023) ....................35, 38

*Underwood v. Bank of Am. Corp.*,
996 F.3d 1038 (10th Cir. 2021) ....................3

*United States v. Charleston Cnty.*,
365 F.3d 341 (4th Cir. 2004) ....................21, 48, 56

*United States v. Sanchez-Garcia*,
98 F.4th 90 (4th Cir. 2024) ....................43

*United States v. Skrmetti*,
605 U.S. 495 (2025)....................38

*United States v. State of Tex.*,
445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) ....................42

*Voting for Am., Inc. v. Steen*,
732 F.3d 382 (5th Cir. 2013) ....................34

*Voto Latino v. Hirsch*,
712 F. Supp. 3d 637 (M.D.N.C. 2024) ....................19, 58

*Wood v. Meadows*,
207 F.3d 708 (4th Cir. 2000) ....................25, 27

*W. Virginia v. B. P. J. by Jackson*,
609 US __ (2026),....................38

*Williams-Yulee v. Florida Bar*,
575 U.S. 433 (2015)....................32

**Statutes & Other Authorities**

U.S. Const. amend. XXVI, § 1 ....................40

52 U.S.C. § 20901 *et seq*....................6

N.C. Const. art. VI, § 3(1)....................31

N.C.G.S. §163-166.12(a)(2) ....................6

N.C.G.S. §163-54....................3

N.C.G.S. §163-55....................3, 4

N.C.G.S. §163-57....................4

N.C.G.S. §163-82-6B....................6

N.C.G.S. §163-82.1....................3, 4

N.C.G.S. §163-82.3....................4

N.C.G.S. §163-82.6....................4

N.C.G.S. §163-82.19....................4

N.C.G.S. §163-82.23....................4

N.C.G.S. §163-82.4....................................................................................4

N.C.G.S. §163-82.4(c)(1) ....................................................................................25

N.C.G.S. §163-82.7....................................................................................6, 7, 31

N.C.G.S. §163-82.7(g)(2) ....................................................................................7

N.C.G.S. §163-89....................................................................................33

N.C.G.S. §163-166.8....................................................................................5

N.C.G.S. §166.9 ....................................................................................5

N.C.G.S. §163-230.2(e1) ....................................................................................5

1917 N.C. Sess. Law Ch. 23 ....................................................................................5

1999 N.C. Sess. Law 455....................................................................................5

## PRELIMINARY STATEMENT

Plaintiffs come to this Court with a monumental ask—to overturn a well-reasoned 108-page opinion that scrupulously evaluated the challenged provision of the law, the Undeliverable Mail Provision of SB 747 (the "UMP"), after a five-day trial with thirteen fact witnesses, four expert witnesses, and dozens of exhibits. The record and Plaintiffs' opening brief offer no support for this request.

Plaintiffs failed to offer testimony from any voter allegedly impacted by SB 747's changes to Same Day Registration ("SDR"). Instead, Plaintiffs presented experts whose work was filled with flawed methodologies and execution, rendering their opinions unreliable. Plaintiffs' legal arguments fare no better. They offer no case law supporting their claim that challenged election laws should be viewed in a vacuum instead of in conjunction with the State's larger election scheme. Plaintiffs failed to identify a concrete class of "young voters," oscillating amongst cohorts aged 18-25, 18-29, and college students, a failure they double-down on before this Court. Plaintiffs also continue to minimize the presumption of legislative good faith—likely because they offered no evidence contradicting the sworn and credible testimony of the bill sponsors confirming that no demographic data, including age data, was used to draft SB 747, and normal legislative processes were followed. Instead, Plaintiffs spend

much of their time attempting to pin discriminatory animus onto the Legislature based on testimony of two third-party witnesses who unequivocally testified that they did not support the UMP, and by invoking bill drafts that never became law.

Affirming the decision below is warranted. The district court's opinion not only correctly applied the appropriate legal benchmarks based on well-established precedent, but it followed them to the appropriate endpoint. The court spent dozens of pages sifting through expert evidence and testimony, including a decisive disparate impact analysis offered by Defendants' expert revealing that the UMP unequivocally did not have a disparate impact on young voters. The court went to great lengths to analyze testimony from key fact witnesses, including from the primary bill sponsors, Senator Warren Daniel, and Representative Grey Mills, and the former General Counsel to the State Board of Elections ("the NCSBE"), Paul Cox, who was involved in the revisions to the UMP that became law. The court also scrutinized testimony from third-party witnesses, Cleta Mitchell and Jim Womack, who testified about their lobbying efforts to eliminate or alter SDR and their unhappiness with the final product. Based on the totality of the evidence before it, the district court correctly concluded that the UMP does not present an undue burden and does not

discriminate against young voters. This Court should affirm that principled opinion.[1]

## STATEMENT OF THE ISSUE

1. Whether the district court correctly entered judgment for Defendants.

## STATEMENT OF THE CASE

### I. North Carolina Makes Registering to Vote Easy and Accessible For All Qualified Persons.

North Carolina provides qualified residents with ample ways to register and vote. Voting requires registration. N.C.G.S. §§163-54, 163-82.1. Registration, in turn, requires meeting the state's definition of "qualified." N.C.G.S. §163-55. North Carolina law defines a person as "qualified" to vote if they are:

(1) a United States Citizen;

[1] Even if the Court found error in the district court's ruling that is not harmless, the Court would be obligated to "remand for further proceedings to permit the trial court to make [any] missing findings." *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982). There is no merit in Plaintiffs' request that this Court reweigh the facts and reach a new conclusion. *Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 398 (4th Cir. 2025); *Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1056 (10th Cir. 2021).

(2) at least 18 years of age on or before the date of the next general election;[2]

(3) not currently serving a felony sentence; and

(4) a resident of the county where the applicant registered and will have lived for the last thirty-days prior to the election in which they wish to vote.

N.C.G.S. §§163-55, 163-57, 163-82.1. Applicants must complete a voter registration form attesting to these qualifications under penalty of perjury. N.C.G.S. §163-82.4; JA1230; JA2134.

North Carolina has three year-round registration options. A qualified person may submit a paper registration form to their county board of elections or other state agencies and government facilities. N.C.G.S. §§163-82.1, 163-82.3, 163-82.6, 163-82.19-163-82.23; JA2134-35. Registration is also available through the North Carolina Department of Motor Vehicles' online portal. *Id.*; JA1227-28. And a registrant may mail, fax, or email an application form directly to their county board of elections. *Id.* These options have been available in some form for over 100 years and are known as "Traditional Registration Methods."[3]

[2] North Carolina is one of only eighteen states allowing 16- and 17-year-olds to preregister. JA2187.

[3] As discussed *infra*, Plaintiffs assign error to the district court's distinction between "traditional registration methods" and "[SDR], which only occurs during the early voting period." Br.12. But this distinction is nothing more than

1917 N.C. Sess. Law Ch. 23 (absentee voting); 1999 N.C. Sess. Law 455 (no-excuse one-stop voting). Traditional Registration Methods use a two-card mail verification system to verify an applicant's mailing address.[4] JA1232-1235, JA1256-1259. If the first mailer is returned undeliverable, a second mailer is sent. JA1235. If the second mailer fails, the registration is denied, and the applicant will not be an active voter. JA1256. There is no cure process if the second mailer is returned undeliverable. JA1257. Once registered, a voter may cast a ballot either by mail-in absentee ballot, in-person early voting anywhere in their county of residence, or at their assigned precinct on election day. JA1217-1220.

North Carolina offers seventeen days of early voting. JA1218. The state also provides no-excuse absentee voting for all registered voters, a system relying almost exclusively on the U.S. Postal Service. JA2195. On election day, approximately 2,600 polling places are open from 6:30 a.m. to 7:30 p.m. with accessible voting options for those who need assistance. JA1219-1221; N.C.G.S. §§163-166.8-166.9, 163-230.2(e1).

---

a recognition of the longstanding registration options offered in North Carolina. All parties embraced this framing throughout the case. JA791 (Plaintiffs' expert distinguishing SDR from "regular registrations"), JA1227-1228 (Cox describing traditional registration methods available to all voters), JA1317-1318 (Plaintiffs' expert discussing "traditional registration" on direct examination), JA1583 (Plaintiffs' counsel referencing "regular registrants" in closing arguments).

[4] Plaintiffs do not challenge that system.

A qualified individual may register to vote using Traditional Registration Methods up to twenty-five days before an election. JA1207-1208. If that window is missed, a qualified individual may instead use SDR, which allows them to register and cast a ballot on the same day. JA1219. North Carolina is among the minority of states that offer SDR in any form. JA2192.

## II. There is No New "Harm" Under SB 747.

Since its inception in 2007, North Carolina has used mail verification for SDR to confirm a registrant's address. 2007 N.C. Sess. Law 253. State law has always required SDR users to provide proof of residence, referred to as a HAVA[5] document in N.C.G.S. §163-82-6B. JA1197-1198. Unlike the HAVA document requirement, mail verification serves the distinct purpose of confirming the voter resides in the district and can receive mail at the address provided.[6] N.C.G.S. §163-82.7; JA81-82, JA1056-1059, JA1268-1271, JA2170-2171. Prior to SB 747, addresses were verified with a two-mailer system similar to that used for Traditional Registration Methods. N.C.G.S. §163-82.7; JA1762-1765. SDR

---

[5] HAVA refers to the federal "Help America Vote Act." 52 U.S.C. §20901, *et seq.* For SDR, a HAVA document refers to valid documents showing a person's current name and current residence address, such as a North Carolina drivers' license, a photo identification from a government agency, or any of the documents listed in N.C.G.S. 163-166.12(a)(2). 2007 N.C. Sess. Law 253; JA1198, JA1884.

[6] This confirms the voter can receive documents like their voter registration card and precinct notification. JA1268-1269, JA2198-99.

ballots have also always been cast as retrievable ballots. 2007 N.C. Sess. Law 253. Because of its retrievable status, if the second mailer was returned as undeliverable before county canvass, the associated ballot could be challenged and removed.[7] N.C.G.S. §163-82.7(g)(2); JA1762-1765. In general elections between 2016 and 2022, 296,859 persons registered to vote using SDR, and approximately 98% successfully verified. JA18, JA1766.

Since 2016, the NCSBE has recognized the logistical and administrative challenges that a two-mailer system creates for SDR; a result of the short time between the close of the SDR window and county canvass. JA1764. That short window resulted in undeliverable second-mailers arriving after canvass, leaving the associated ballot in the count despite failed verification. JA1056-1057, JA1764. This was just one of "a lot of things in the elections" that people were "concern[ed] about, following the November 2022 general election." JA996, JA1055-1058.

## III. SB 747's Origins Embody the Ideal Legislative Process.

SB 747 did not arise in a vacuum. Its origins exemplify the ordinary workings of the legislative process.

---

[7] For several years preceding SB 747 the NCSBE interpreted a 2018 injunction in a separate case to prevent statutory challenge processes from applying to SDR ballots. JA1275-1277. Therefore, the NCSBE could not use the challenge process to challenge an SDR voter whose second mailing was returned undeliverable. JA1276; JA2163.

North Carolina's political power is vested in its people and exercised through the Legislature. *Harper v. Hall*, 886 S.E.2d 393, 414 (N.C. 2023). Those elected officials are entrusted with enacting laws that reflect the will of their constituents, and they remain accountable for those choices through frequent elections. *Id.*; *State v. Berger*, 781 S.E.2d 248, 261 (N.C. 2016) (Newby, J., concurring in part and dissenting in part). Statutes passed by the Legislature therefore carry a presumption of good faith. *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020).

Following the November 2022 election, several election advocacy groups and constituents raised concerns about election administration. JA996, JA1006-1007, JA1019-1020, JA1037, JA1108-1109. Senator Daniel and the co-chairs of the Senate Elections and Redistricting Committee (Senators Ralph Hise, Jr. and Paul Newton), received over seventy-fiv election policy recommendations, some involving SDR, which they filtered through the legislative process. JA990, JA994, JA996, JA1006-1007. In the spring of 2023, Senator Daniel met or corresponded with constituents and election groups around the state. JA997, JA1006-07, JA1019-20, JA1037.

One of those groups was the North Carolina Election Integrity Team ("NCEIT"), led by Jim Womack. JA996. During a meeting with Senator Daniel

and his co-chairs in May 2023, Womack, joined by Mitchell[8] presented a PowerPoint including "recommendations" for electoral changes in North Carolina, including the recommendation to "eliminate Same Day Registration." JA1003-1005, JA1835-1858. NCEIT's alternative recommendation was to make those ballots provisional, allowing address verification and challenge prior to canvass. JA1851. While Mitchell did not specifically recall advocating at the meeting for eliminating SDR, she testified that if the subject had come up, she would have argued for SDR's complete elimination. JA783. That meeting was the only contact between Mitchell and legislators about SB747; she never returned to Raleigh and, despite her offer to help, no legislator reached out. JA763, JA771, JA784-785.

SB 747's first draft was introduced in the North Carolina Senate on June 1, 2023 and proposed that all SDR voters use provisional ballots. JA1746, JA1755. Senator Daniel denied that this provision arose from NCEIT's alternative proposal, because "more than one" group was "making this recommendation." JA1006-1007. His primary concern was to prevent having a second mail verification returned after the canvass, when the ballot could not be retrieved. JA1018-19; JA1034. As Senator Daniel explained, those timing

[8] Daniel testified he was previously unaware of Mitchell. JA1000-1001.

problems risked undermining confidence in North Carolina's elections, the very issue constituents were raising. JA1038, JA1035.

Properly noticed debates on the bill draft were held in committee on June 14-15, 2023. JA1038, JA1635. During those debates, the provisional ballot language was amended so that SDR users would cast a provisional ballot only if the addresses on their photo ID and HAVA document did not match. JA1724-1725. As amended, voters facing such issues could still confirm their ballot by submitting certain documentation before county canvass. *Id*. This addressed the underlying concern of counting unregistered voters' ballots even if they failed mail verification. JA1018-19; JA1034-1035. On June 21, 2023 the Senate debated SB 747 on the floor; ten amendments were offered, three were adopted, none pertaining to SDR. JA1010, JA1634-1635. The bill passed to the House the following day. JA1634.

Representative Mills, Chair of the House Election Committee, took the lead on carrying SB 747 through the House. JA1043. Representative Mills had no prior involvement in, or knowledge of, the Senate process that produced SB 747. JA1052-1053. He quickly reached out to the NCSBE for feedback and collaboration on a proposed committee substitute designed to make SB 747 more workable for election administrators. JA1096-1097. Like Senator Daniel, Representative Mills shared concerns about the timing and administrative

difficulties of the two-mailer system for SDR users. JA1108-1109. He was also personally aware of broad interest in election law changes following the November 2022 general election, including concerns about improper votes being counted. JA1055-1059; JA1108-1109.

Working closely with Representative Mills' team on SB 747's provisions, the NCSBE identified administrability concerns with the provisional ballot language the Senate had adopted. JA1102-1103, JA1109-1110. On July 3, 2023, the NCSBE's general counsel, Paul Cox, transmitted draft language addressing those concerns, including a revised approach that replaced the provisional ballot mechanism with a single mail verification card.[9] JA1937-1938. Under that proposed language, if the mailer was returned undeliverable before canvass, the county board would retrieve and set aside the associated ballot. JA1938. As both Cox and Representative Mills confirmed at trial, this approach was more workable and addressed the issue the Legislature was focused on: late-arriving, undeliverable verification mailers leaving ballots in the count. JA1177-78, JA1186-88, JA1098-1100.

These and other proposed changes were incorporated into a proposed committee substitute. JA1869-1881, JA1111-1112. On August 15, 2023, the

[9] Cox testified that it was the NCSBE's role to review proposed legislation and educate legislators about potential impacts on administrability and voters. JA1180-81.

House Committee on Election Law and Campaign Finance held a properly noticed hearing and debate. JA1114, JA1634. The hearing ran so long that the committee required special permission from leadership to extend its session. JA1114. The committee ultimately reported as favorable the proposed committee substitute. JA1634, JA1680-1722. The NCSBE's single-mailer approach became part of the UMP in §10.(a) of the bill. JA1640-1641.

The Legislature ratified SB 747 on August 17, 2023. JA1631. Senator Daniel testified that he voted for the bill as amended because he believed the UMP addressed the concerns that prompted the legislation. JA1036, 1640-41.

## IV. The UMP Serves Well-Settled Governmental Interests.

SB 747, including the UMP, arose from widespread concerns regarding election integrity and finality, with later revisions proposed by the NCSBE to ensure administrability. JA1006-07, JA1019-20, JA1108-09, JA1873, JA1937-1938. Senator Daniel explained that the policy reason behind the initial draft of SB 747 was to prevent the second mail verification coming back after canvass leaving the ballot unretrievable. JA1018-19; JA1034-1035. Representative Mills shared that concern. JA1108-09. As the district court recognized, North Carolina's general interest in election integrity necessarily includes "not only the prevention of actual fraud, but also addressing the appearance of fraud, which is harmful to democracy." JA89 (citing *Crawford v. Marion Cnty. Election Bd.*, 553

U.S. 181, 197 (2008)). Indeed, as Defendants' expert, Dr. Andrew Taylor found, many North Carolinians share legitimate concerns about voter fraud. JA1400. This is especially true given a 2018 federal election which the NCSBE voided due to significant evidence of fraud. JA38 (citing JA1400). The UMP furthers Legislature's longstanding interests in election integrity and promoting public confidence in the electoral process, while balancing administrability. JA87-90, JA1006-7, JA1035, JA1055-1059, JA1764.[10]

The record reflects that the UMP was the product of a robust legislative process, untainted by any deviation. JA1038-1039, JA1115.

Underscoring this reality is expert testimony that North Carolina has not historically sought to suppress youth voting. To the contrary, youth voter participation increased following SB 747. JA868. The only expert to conduct a genuine comparative analysis, Defendants' expert, Taylor, concluded that North Carolina is a nationwide leader in promoting youth voting. JA1379,

---

[10] In reply, Defendants suspect Plaintiffs may claim that Senator Daniel disclaimed that late mailers constitute voter fraud. JA1034. This lacks appropriate context. Senator Daniel testified that a late-arriving mailer is not necessarily voter fraud, but it indicates the voter was not qualified under the law. JA1018-1019; JA1034-35. His concern was that an ineligible voter would cast a ballot, potentially affecting close elections by canceling out a valid vote. *Id*. Relatedly, Representative Mills testified that there "probably is voter fraud" in North Carolina, although "most of the time" the issue "is probably mistakes." JA1046. Regardless of the label, the testimony addressed concerns about election integrity and voter confidence. JA87, JA1035, JA1055-1059.

JA1384-1385. In the 2024 General Election, North Carolina was among the battleground states which had the highest turnout for voters aged 18 to 29.[11] JA1385. North Carolina's public universities are leaders in voter registration, in part because of the extensive network of early voting sites, many located on campuses. JA1389-1390. North Carolina also permits certain student identification cards to serve as valid voter ID, a feature Plaintiffs' expert, Dr. Jacob Grumbach, ignored. JA1391-1392, JA1967.

As Taylor demonstrated, only a small fraction of North Carolinians use SDR—approximately three percent in presidential elections, and fewer in midterms—regardless of age. JA1392-1394, JA2191. Plaintiffs and Grumbach failed to identify any recent or consistent pattern of legislative efforts to suppress youth voting in North Carolina. Taylor showed the opposite. JA2182-2189. North Carolina was one of the first states to ratify the Twenty-Sixth Amendment and is among the few states that permit 16-17-year-olds to preregister to vote. JA2183, JA2187. College students in North Carolina are the only population who can choose to register at either of two addresses (college or home). JA1391. The state's residency requirements are consistent with federal norms, and

[11] As discussed in Taylor's report, JA2180-2181, there is no academic consensus defining "youth" voters, and Plaintiffs' scattershot attempts are highly arbitrary. JA1383-1384.

Traditional Registration Methods remain available throughout the period when college voters typically relocate. JA1390-1391, JA1394-1396.

Nothing in SB 747 alters this landscape. "Youth" voters, however defined, may still register through the method of their choice and Plaintiffs may conduct college campus registration drives without interference, as they did before SB 747 took effect. JA954, JA983-984.

## V. The UMP Lacks Any Discriminatory Motive, Intent, or Impact.

Plaintiffs contend this case is about "nothing more than taking legislators at their word." Br.35. Defendants agree. Unrefuted testimony from the bill sponsors establishes that Mitchell and Womack, who Plaintiffs accuse of harboring discriminatory motives, had no influence over the UMP's final form. JA1036-1039, JA1113-1114. The NCSBE and Democracy NC did. JA953-954, JA1100. Senator Daniel and Representative Mills, confirmed that nothing in SB 747, including the UMP, was intended or understood to have any effect on "young" voters, disparate or otherwise. JA1036-1039, JA1113-1114. They never requested or reviewed any age-related data. JA1039-1040, JA1105. When another legislator raised that concern during debate, she was invited to submit supporting data. JA1028-1030. None was offered. *Id.* The bill's sponsors regarded the UMP as a modest, "common-sense" provision supported by broad constituent feedback, enacted through an expansive deliberative process marked

by extended committee debate and amendments. JA1006-07, JA1015, JA1019-20, JA1035, JA1038-39, JA1056-1057, JA1627-1636.

Lacking any direct evidence of discriminatory intent from the actual decisionmakers, Plaintiffs seek to impute discriminatory animus to the Legislature through Womack and Mitchell. Br.35-42. The record does not support that theory. There is no evidence that any member of the Legislature was aware of Womack or Mitchell's personal views or that they were incorporated into SB 747. JA783-785, JA1036-1039, JA1113-1114

The record instead shows that Mitchell and Womack's interactions with the Legislature were limited in both time and scope. At their single meeting with Senator Daniel, neither Senator Daniel, Womack, nor Mitchell had any understanding of SDR usage by age group. JA783, JA1035, JA1171. After that meeting, Mitchell had no further contact with any member of the Legislature regarding SB 747 or SDR. JA771. Womack sent several emails to Representative Mills, most of which went unanswered. JA1928-1930. Representative Mills met with Womack on just one occasion, and he never met with Mitchell. JA783, JA1113. Despite offering, neither Mitchell nor Womack participated in drafting any of the UMP. JA784-785, JA1173. Neither believed the Legislature was responsive to their concerns. Both were dissatisfied with the

final form of SB 747. As Womack put it, they "didn't get anything" they wanted on SDR. JA783-785, JA1173.

Much like their discriminatory intent characterizations, Plaintiffs' disparate impact claim fares no better. Defendants' expert Dr. Paul White—the only expert experienced in conducting disparate impact analyses, JA567, JA844—confirmed that the historical data reveals no disparate impact on young voters. JA2336-2338. Plaintiffs' expert, Dr. Kevin Quinn provided reports with duplicate records, discrepancies, incorrect designations, overbroad and unfounded definitions, and a lack of principled methodology.[12] JA856-857, JA2316. While some of Quinn's issues were corrected in a supplemental report, methodological issues and assumptions—like calculating age only by birth year and including mail verification from list maintenance and non-SDR use, among others—remained. JA65-66, JA864-65, JA2358. The Court found no errors in White's analyses. JA66. In fact, White revealed that when compared to pre-SB 747 rates, there is no statistically significant difference between denial rates for those voters who failed verification under the two-mailer system and post-SB 747 denial rates for voters who received only a single mailer. JA1446, JA1462-

[12] Plaintiffs' contention that Quinn's errors are "unsupported by the record," defies reality and is defeated by, among other things, Quinn's own admissions. JA808-811, JA860-861.

1464, JA2227-2229, JA2236. This is consistent across the past ten election cycles. JA2307.

The same holds true for the 2024 election, including the notice-and-cure process implemented through the consent decree discussed below. *Infra* p.19; JA2353-2354. Youth voting increased in 2024, yet "young" SDR voters, as Plaintiffs defined them, accounted for only 0.7% of total votes cast. JA869-870. The denial rate for voters failing mail verification was within the historical range of denial rates from preceding general elections since 2016. JA888-889, JA1766-1781, JA2307. The data indicates that the new process established by SB 747 and altered for the 2024 elections produced a net positive effect as administered. JA1513.

The evidentiary deficit extends to affected voters. Plaintiffs' presented no testimony from any voter harmed by SB 747.[13] JA83-85. The record is accordingly silent on any actual harm to any actual voter.

## VI. Plaintiffs Bring Suit and Lose at Trial.

Plaintiffs filed suit on October 10, 2023, asserting three claims: that the UMP violates voters' procedural due process rights (Count I), the UMP imposes

[13] The district court excluded witness Jaimee Suwalkowski, whose disclosure was untimely and improper. JA694-703. Plaintiffs then offered Suwalkowski as an "impeachment" witness, which similarly failed. JA58 n.12. Plaintiffs do not assign error to this exclusion, and they have thus waived it on appeal. *McBurney v. Young*, 667 F.3d 454, 470 (4th Cir. 2012), *aff'd*, 569 U.S. 221 (2013).

an undue burden on the right to vote (Count II), and the UMP discriminates against young voters on the basis of age in violation of the Twenty-Sixth Amendment (Count III). JA146-188. Prior to trial, the district court entered a consent judgment in a related case, *Voto Latino v. Hirsch*, 1:23-cv-861 at D.E. 125-1 (M.D.N.C. Apr. 28, 2025) ("Consent Judgment"), formalizing the NCSBE's directive to County Boards of Elections in Numbered Memo 2023-05 ("Numbered Memo") establishing a notice-and-cure procedure for SDR users implemented by the NCSBE in response to an earlier injunction entered in *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 684 (M.D.N.C. 2024). JA4-5. That Numbered Memo includes a judicially sanctioned notice-and-cure process, preventing the removal of ballots if the mail verification is returned undeliverable within two days of canvass. JA1882-1894. It also bars removing ballots for verifications returned undeliverable due to clerical errors. JA1887-1888. Taken as a whole, the Consent Judgment and Numbered Memo's enduring safeguards present the UMP's complete legal landscape.

After the Consent Judgment, Plaintiffs voluntarily dismissed Count I and proceeded to trial on Counts II and III. JA5. Following a five-day bench trial featuring seventeen witnesses and seventy-seven exhibits, the district court entered its Order on March 26, 2026, finding in Defendants' favor on the remaining counts. JA1-108. Plaintiffs appealed. JA2500.

## SUMMARY OF THE ARGUMENT

The district court's opinion should be affirmed.

First, the district court's judgment on both claims is supported by precedent from this Circuit and the Supreme Court of the United States holding that:

- The Legislature's actions are entitled to a presumption of good faith;
- The challenged statute must be reviewed in the context of the state's entire election scheme as currently administered; and
- The court must properly weigh the character of the law and the evidence to determine the appropriate level of scrutiny, instead of just accepting Plaintiffs' chosen scrutiny label.

The district court followed this precedent. Plaintiffs' arguments that it was clear error for the district court to: (1) apply the presumption of legislative good faith; (2) review the UMP as part of North Carolina's entire election scheme; and (3) evaluate their chosen strict scrutiny label, are foreclosed under well-settled precedent.

Second, the district court's ruling on the Twenty-Sixth Amendment claim can be affirmed by following the path projected in *Lee v. Va. State Bd. Of Elections* and holding that the *Anderson-Burdick* test applies to Twenty-Sixth Amendment

claims. By failing to address the *Anderson-Burdick* balancing test in their brief, Plaintiffs have waived any argument that their Twenty-Sixth Amendment claim could survive the *Anderson-Burdick* balancing test.

And finally, even if this Court declines to resolve the dispute through applying *Anderson-Burdick,* Defendants still prevail when *Arlington Heights* is applied to Plaintiffs' Twenty-Sixth Amendment claim.

## STANDARD OF REVIEW

Defendants generally agree with Plaintiffs that findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. Br.10. However, the appellate court's "function is not to reweigh the evidence presented to the district court." *United States v. Charleston Cnty.*, 365 F.3d 341, 349 (4th Cir. 2004). Moreover, the Court's "role in reviewing the district court's" assessment of "expert testimony is limited." *Levy v. Lexington Cnty.*, 589 F.3d 708, 719 (4th Cir. 2009).

## ARGUMENT

### I. The District Court Correctly Rejected Plaintiffs' Undue Burden Claim.

The Constitution vests states with broad authority to regulate their elections. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). That authority does not vanish because a regulation "inevitably affects—at least to some degree—the individual's right to vote[.]"

*Anderson*, 460 U.S. at 788. "Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id*. Under *Anderson-Burdick*, a court must balance a law's burden against the state's interests by examining the challenged provision within the context of the state's entire electoral system. *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 671 (2021). That is because the focus is on the openness of the franchise, not elevating one voter's preferred method of voting over another's. *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807-08 (1969).

The parties agree that *Anderson-Burdick* governs Plaintiffs' undue burden claim. Br.10-11. Applying that framework, the district court correctly held that the UMP does not unduly burden the right to vote. JA89-90. Plaintiffs seek reversal of that well-reasoned decision on three grounds, arguing:

(1) the court erred by evaluating the UMP within the state's full electoral scheme rather than in isolation, Br.11,14-17;

(2) the court's analysis was "infected" by recognizing distinctions among North Carolina's registration methods and referring to longstanding alternatives as "Traditional Registration Methods," Br.12-14; and

(3) the court should have accepted Plaintiffs' severity label and applied strict scrutiny without further analysis. Br.14-22.

Each argument is foreclosed by the record and precedent. The UMP is an evenhanded, universally applicable law tied to voter qualifications including residency and the ability to receive mail at the address provided on their voter registration. JA81; JA1056-1059; JA1018-1019; JA1268-1269. It draws no distinctions based on any voter's demographic or personal characteristics. *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 717-18 (4th Cir. 2016). The district court's ruling on undue burden should be affirmed.

### A. The District Court Correctly Assessed the UMP's Burden Within North Carolina's Whole Electoral System.

In conducting an *Anderson-Burdick* balancing test, a court must do as the district court did here: assess the law's burden through a holistic review of the full electoral scheme and the actual evidence adduced at trial, not merely conjecture and speculation.[14] *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 152 (3d Cir. 2022) ("Evidence is key to the balancing of interests at the heart of the *Anderson-Burdick* framework."). Plaintiffs abandon that obligation and demand an individualized inquiry contrary to *Anderson-Burdick*'s purpose. *Cf. Richardson v. Texas Sec'y of State*, 978 F.3d 220, 235-36 (5th Cir. 2020); *Crawford*, 553 U.S. at 200.

[14] This includes reviewing the UMP alongside the Consent Judgment, something Plaintiffs largely ignore. JA4-5, JA1882-1894.

Plaintiffs argue the district court "downplayed" the UMP's burden by ignoring the precise moment it becomes operative. Br.14-17 To the contrary, the court performed the required analysis. JA80-81, JA84-85. It considered Plaintiffs' "after-the-fact disenfranchisement" theory explicitly, assumed its accuracy *arguendo*, and rejected the claim on the merits. JA85 n.19. Thus, any assignment of error based on a perceived failure to conduct such an analysis must fail.

Furthering their snapshot theory of *Anderson-Burdick*, Plaintiffs contend without citation that the framework is indifferent to whether a voter has other options. Br.15. That fundamentally misreads *Anderson-Burdick*'s core purpose. *Crawford*, 553 U.S. at 199-200. Measured against the full scope of SB 747 (including the Consent Judgment), North Carolina's broader voting system, and weighed against the State's well-established legislative justifications, the UMP withstands any level of scrutiny.

Plaintiffs' static approach to *Anderson-Burdick* through their "*ex post* context" characterization fails for three additional reasons. Br.15.

First, Plaintiffs cite no authority for evaluating a challenged law through an artificially truncated window while disregarding the choices and circumstances preceding the operative moment at which the law supposedly becomes burdensome. Defendants are unaware of any court sanctioning this

approach. *Cf. Wood v. Meadows*, 207 F.3d 708, 711 (4th Cir. 2000); *Luft v. Evers*, 963 F.3d 665, 671-72 (7th Cir. 2020).

Second, even if authority existed, the theory still fails on the merits: the very risk Plaintiffs label an "*ex post*" burden, including post office errors or addressing mistakes, existed under the prior two-mailer system. JA2347-2349.[15] The district court recognized that both systems, pre- and post-SB 747, carried the same risks. JA85 n.19. While address verification in SDR serves uniquely cognizable interests, the UMP balances its challenges while introducing no burden an SDR voter did not already face. JA1036, JA2347-2349. The record contains no evidence that any SDR voter is worse off than before SB 747. JA1479-1480, JA1492, JA2218.

Third, and dispositive on its own, Plaintiffs presented no evidence from any affected voter, let alone any evidence showing that the UMP caused the harm Plaintiffs describe. JA83-86. The actual evidence tells a different story. Youth voting <u>increased</u> following SB 747's passage. JA868-869. Plaintiffs' approach to *Anderson-Burdick* ignores that reality.

---

[15] Plaintiffs ignore that SDR voters attest to the accuracy of their address information at registration, undercutting any suggestion that the UMP burdens voters through no fault of their own. N.C.G.S. §163-82.4(c)(1). Moreover, the absence of any testimony from any affected voter leaves no evidentiary basis for the conclusions Plaintiffs urge. *Cf. Mazo*, 54 F.4th at 152.

The district court reviewed the UMP both at the temporal moment Plaintiffs invoke and within the broader voter registration framework. JA80-85. At either vantage point, Plaintiffs failed to produce evidence supporting their severity label.[16] JA83-85.

### B. The District Court Did Not Create New or Improper Voter Classifications.

Plaintiffs contend that the district court treated SDR users as an "inferior class of voters," distorting its assessment of the burdens those voters face. Br.12-14. The district court did not invent the Traditional Registration Method versus SDR distinction, nor did it relegate the latter to "second-class voter" status. *Id*.[17] The court's analysis reflects nothing more than what the record shows: voters who choose SDR face certain well-known risks accompanying their choice to register and vote on the same day. JA17, JA83-85, JA1762-1765, JA2200.

In concluding that the UMP is not an undue burden, the district court never differentiated among voters based on chosen registration method. Instead,

---

[16] Plaintiffs' citation to *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 632 (6th Cir. 2016) is not persuasive. Not only was *Husted* abrogated on other grounds by *Tennessee Conference of Nat'l Ass'n for the Advancement of Colored People v. Lee*, 139 F.4th 557, 562-67 (6th Cir. 2025), but it dealt with an absolute ballot rejection based on inaccurate birthday and address information, without any opportunity or flexibility to cure. *Husted*, 837 F.3d at 631-32. That is far removed from the current legal landscape.

[17] Plaintiffs bemoan the court's use of "traditional registration methods." Br.12. But all parties adopted this same framing throughout the case. *See supra* p.4-6.

the court catalogued those registration options, observed that each is equally available to all North Carolina voters, set those observations against the state's historical registration framework, and analyzed the UMP's role within that broader structure as it was required to do. JA13-20, JA81-83; *Wood*, 207 F.3d at 711. To the extent Plaintiffs fault that approach, their grievance lies with the realities of individual choice and the risks attending SDR regardless of SB 747. Plaintiffs had every opportunity to contest that conclusion at trial and yet they presented nothing. JA84-85. The court's holding is not an "infect[ed]" analysis warranting reversal. Br.11. It is precisely the kind of review precedent demands. *Buscemi v. Bell*, 964 F.3d 252, 263 (4th Cir. 2020).

The risks with SDR are nothing new. In 2016, the NCSBE was aware that a number of same day registrants would fail mail verification after the county has finished its canvas. JA1762-1765. That a challenged electoral scheme carries different risks or requirements for different registration options does not transform an accurate observation of those differences into reversible error. *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1096-97 (9th Cir. 2019); *McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1222-23 (4th Cir. 1995).

Every qualified voter in North Carolina may use any of the state's registration methods. *See supra* p.3-6. Plaintiffs ignore this fact, asserting without citation that alternative options are "irrelevant" to *Anderson-Burdick*. Br.13. That

defies precedent and common sense. The burden attaching to a particular choice is naturally diminished when alternatives are readily available. *Brnovich*, 594 U.S. at 671 ("[W]here a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means."); *Raymond*, 981 F.3d at 309-10. The UMP's burden, to the extent one exists at all, flows from North Carolina's registration system and the choices voters make within it. *Clingman v. Beaver*, 544 U.S. 581, 592-93 (2005). Nothing in the district court's *Anderson-Burdick* analysis indicates that it did anything more than observe this reality. It certainly did not introduce new classifications or concepts.

### C. The District Court Rightly Found the UMP Is Not a Severe Burden on Voting Rights.

*Anderson-Burdick* challenges are not subject to a formulaic approach. *Anderson*, 460 U.S. at 789. Every analysis begins with the threshold question of where a law's burden falls on the severity spectrum. *McLaughlin*, 65 F.3d at 1220-21. A "severe" burden triggers strict scrutiny; a modest burden demands only cognizable justifications rationally related to the burden imposed. *Buscemi*, 964 F.3d at 263. Courts are reluctant to find severe burdens. *Alcorn*, 826 F.3d at 717. As the Supreme Court has cautioned, a "severe" designation is typically reserved for regulations "irrelevant to [a] voter's qualifications" and thus "invidious."

*Crawford*, 553 U.S. at 189-90. This Court has gone further, observing that in every case where an election law was struck down under strict scrutiny, "the state law under attack prohibited an identified class of persons from voting." *Greidinger v. Davis*, 988 F.2d 1344, 1349-50 (4th Cir. 1993) (collecting cases) (emphasis added). In practice, this often means that severe burdens are those which target suspect classifications. *Fusaro v. Cogan*, 930 F.3d 241, 261 (4th Cir. 2019).

Plaintiffs' severe burden arguments fail from the outset. Under Plaintiffs' theory, the court should have accepted their "severe" label at face value, immediately applying strict scrutiny. Br.14-17. Plaintiffs' opening brief confirms as much: it argues nothing beyond strict scrutiny, failing to grapple with the notion that their claims fail at every other level of *Anderson-Burdick*'s sliding scale. Br.17-22. But a party's characterizations carry little weight in determining a law's actual burden. *Richardson*, 978 F.3d at 236 n.33 (deferring to a plaintiff's severity assertions converts *Anderson-Burdick* into a standing inquiry); *Crawford*, 553 U.S. at 208 (Scalia, J., concurring) ("Very few new election regulations improve everyone's lot, so the potential allegations of severe burden are endless.").

Plaintiffs' opening brief sidesteps this analysis entirely. Despite titling the UMP the "most severe burden," (Br.15), Plaintiffs did not offer any testimony

from any voter who was impacted by SDR, rendering their label meaningless. *Feldman v. Arizona Sec'y of State's Office*, 208 F. Supp. 3d 1074, 1090 (D. Ariz. 2016), *aff'd*, 9 F.4th 1218 (9th Cir. 2021) (mem.) (declining to adopt plaintiff's severity label, especially when they made the "telling" decision not to produce any evidence from any affected voter). Plaintiffs rely instead on hypotheticals unsupported by the record, leaving dispositive questions unanswered. Who exactly does the UMP burden? JA81-82. Why, if it is so burdensome, did youth voting increase after SB 747's passage? JA868-869. Why did Plaintiffs not present evidence from any voter supposedly burdened? JA84-85. The district court asked these same questions and Plaintiffs failed to answer them.

*Anderson-Burdick* requires more than conjecture, and reversal on such a basis is improper. *Crawford*, 553 U.S. at 187, 202-03 (affirming a law's constitutionality when there was no evidence from any voters actually burdened). The UMP is not among the rare instances warranting strict scrutiny. *Alcorn*, 826 F.3d at 717. Even if it were, the UMP remains constitutional both under this Court's precedent and on the record.

#### i. Precedent Forecloses Plaintiffs' Severity Arguments.

The district court correctly held that the UMP is related to voter qualifications, including the constitutional requirement of registration and verifying that the individual lives at the address provided. JA81-82; JA1018-

1019; JA1056-1059. No party disputed that a voter must be registered in North Carolina. JA13, JA597, JA1227; N.C. Const. art. VI, § 3(1). And the court correctly noted that "SDR in North Carolina has always used mail verification to confirm an individual's residence." JA17; JA1765. The UMP is also important for confirming that the applicant can receive mail at the provided address and resides in the district he/she is registered in. N.C.G.S. §163-82.7; JA1056-1059, JA1268-1269, JA2170-2171.[18] Plaintiffs' briefing instead argues against the use of mail verification generally. Br.21-22. But mail verification has always been used for SDR and Traditional Registration Methods, and it has always carried the same risks they now decry.[19] 2007 N.C. Sess. Law 253. The alternative requirements Plaintiffs champion as superior ways of achieving the State's interests each serve indisputably different purposes.

Plaintiffs' severity argument faces an additional and independent obstacle: the UMP singles out no identified class of voter. *Greidinger*, 988 F.2d at 1349-50. Plaintiffs' brief does not address this critical flaw, likely because the record

---

[18] Plaintiffs claim that the state "does not have a freestanding interest in utilizing a verification mailing system." Br.21. North Carolina's election statutes and Traditional Registration Methods say otherwise. N.C.G.S. §163-82.7. And it is not Plaintiffs' role to define the boundaries of the state's interests for it. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363-64 (1997).

[19] Mail verification would remain under the system Plaintiffs ask this Court to reinstate. JA17-18. And like that prior system, a ballot will not be removed if the verification is returned undeliverable within two days of canvass. *See supra* p.19.

defeats it. The UMP applies equally to all voters who choose to use SDR. *Fusaro*, 930 F.3d at 261. It is a viewpoint-neutral statute grounded in cognizable election administration concerns. JA81-82, JA1034-1035, JA1108-1109. Plaintiffs' brief still does not define a cognizable class, and precedent forecloses it. *Infra* p.40-43.

Even if the UMP imposed a severe burden, which it does not, this would not warrant reversal. All that strict scrutiny requires is narrow tailoring to advance the state's interests. *Crawford*, 553 U.S. at 190. Backed by well-established interests in election integrity, administration, and finality, the UMP addresses the documented timing challenges of SDR's proximity to election day and county canvass, while implementing a system designed to address known issues. JA86-89, JA1034-1035, JA1108-1109. The current law passes even the most exacting scrutiny because, even with strict scrutiny, perfection is not required.[20] *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 454 (2015). And strict scrutiny is not a vehicle to substitute a party's policy preferences for the Legislature's considered judgment.[21] *Timmons*, 520 U.S. at 365.

---

[20] Plaintiffs' citation to *Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 449 (E.D.N.C. 2025), is unavailing. *Griffin* addressed post-election ballot removal for voters designated "Never Residents" without notice or an opportunity to be heard. *Id.* at 449-50. The current system provides notice and opportunity to cure. JA4-5, JA1895-1907

[21] Plaintiffs claim that "unlike any other method of voting," only SDR voters "cannot be assured their ballots will count." Br.17. This is simply untrue. Even validly cast ballots under other voting methods may be discounted for a variety

### ii. The District Court Properly Balanced the UMP's Minimal Burden Against the State's Well-Settled Interests.

Any analysis of a statute's burden must begin with the presumption of legislative good faith and authority. *McGowan v. Maryland*, 366 U.S. 420, 425-26 (1961); *Raymond*, 981 F.3d at 303-04. "The requirement that states articulate their asserted regulatory interests is not a high bar." *Buscemi*, 964 F.3d at 265 (quotations and citation omitted). "When, as here, a statute places only a modest burden on [a constitutional] right[], 'a State's important regulatory interests will usually be enough to justify its reasonable, nondiscriminatory restrictions.'" *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 759 (4th Cir. 2010) (quotation omitted). This Court consistently recognizes a state's interest in efficient election administration and integrity. *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 606-07 (4th Cir. 2016); *Nelson v. Warner*, 12 F.4th 376, 389-90 (4th Cir. 2021); *Pisano*, 743 F.3d at 934-37; *Raymond*, 981 F.3d at 302.

Plaintiffs' briefing casts aside legislative good faith and the State's established interests. Despite their attempts to ignore it, ample record evidence establishes that the UMP was borne of legitimate and long-recognized concerns. Unrefuted testimony from the bill's sponsors illustrated how the UMP was

---

of reasons. JA2136-2162 (Numbered Memo 2023-04) (outlining when a provisional ballot may be counted or discounted); N.C.G.S. §163-89 (absentee ballot challenge procedures).

grounded in constituent concerns. *See supra* p.7-12. Moreover, SB 747's changes to SDR were viewed as a minor portion of the bill, backed by "common sense." JA1015. At no point was age-related data requested or used in drafting. JA1039-1040, JA1105. Third parties advocated for changes to the initial version of SB 747. Some, including the NCSBE and Democracy NC, successfully obtained the removal of the original provisional ballot language. JA953-954, JA1100, JA2163-2168. Others, like Womack, Mitchell, and NCEIT, were not so lucky. JA783-785, JA1172-1173.

Plaintiffs argue that because the NCSBE would not have sought changes to SDR on its own it must demonstrate SB 747's justifications were discriminatory. Br.22. That argument inverts *Anderson-Burdick*'s framework. A Legislature acts well within its authority when it responds to documented constituent concerns, and a state need not wait for a problem to fully materialize before addressing it. *Crawford*, 553 U.S. at 195-96; *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013). The Legislature's decision to address well-documented issues with a two-mailer system through the UMP's one-mailer system is a legitimate policy choice, not a constitutional violation.

Taken as a whole, the UMP's minimal burden is justified by the state's settled interests. Any burden is further mitigated by the law's notice-and-cure

process and North Carolina's robust registration offerings. This satisfies any level of *Anderson-Burdick*. The district court's findings should be affirmed.

## II. The District Court Correctly Found Plaintiffs' Twenty-Sixth Amendment Claim Fails Under Either *Anderson-Burdick* or *Arlington Heights*.

The district court's rejection of Plaintiffs' Twenty-Sixth Amendment claim should likewise be affirmed. First, the court correctly recognized that it is unsettled whether *Anderson-Burdick* or *Arlington Heights* governs such claims, and that Plaintiffs failed to argue any alternative to *Arlington Heights*.[22] JA105 n22. Second, even under Plaintiffs' preferred *Arlington Heights* framework, the court correctly found that Plaintiffs failed every factor.

### A. *Anderson-Burdick* Is the Correct Framework for Twenty-Sixth Amendment Claims.

No circuit has definitively resolved whether *Anderson-Burdick* or *Arlington Heights* governs claims of intentional age-based discrimination under the Twenty-Sixth Amendment. *Tully v. Okeson*, 78 F.4th 377, 382 (7th Cir. 2023); *Texas Democratic Party v. Abbott*, 978 F.3d 168, 183-84 (5th Cir. 2020). In *Lee v. Va. State Bd. of Elections*—the only Fourth Circuit opinion on point—this Court expressed skepticism about importing Fifteenth Amendment doctrine into the

[22] Similarly, Plaintiffs failed to address *Anderson-Burdick*'s balancing test for their Twenty-Sixth Amendment claim, waiving that argument on appeal. *Infra* p.39.

Twenty-Sixth Amendment context. 843 F.3d at 607 ("[I]t is far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles from Fifteenth Amendment jurisprudence.").

The district court shared that skepticism. JA93-95. The *Arlington Heights* test was "distilled to ferret out racial discrimination specifically," since racial discrimination "is not just another competing consideration." JA94 (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). Despite Plaintiffs' efforts to conflate the standards, the law is clear: age-based classifications are not treated the same as racial ones. Only the latter are inherently suspect. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83 (2000); *see* JA94-95.

The *Arlington Heights* framework is driven by strict scrutiny and suspect classifications: its force depends entirely on what scrutiny level governs the underlying characteristic. *Cf. Farm Lab. Org. Comm. v. Stein*, 56 F.4th 339, 351-53 (4th Cir. 2022). Importing *Arlington Heights* wholesale into a Twenty-Sixth Amendment claim would attach a demanding intent-plus-effect framework to an underlying characteristic that would likely not trigger heightened scrutiny standing alone.

Plaintiffs point to *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County, Maryland*, 915 F.3d 256 (4th Cir. 2019) ("*JCIAM*"), to justify extending

*Arlington Heights* to Twenty-Sixth Amendment claims. Br.25-26. But *JCIAM* was a religious land-use case under RLUIPA and the First and Fourteenth Amendments. Its *Arlington Heights* analysis rested on RLUIPA nondiscrimination claims that expressly "look[] to equal protection precedent" to supply the governing standard. *Id.* at 260, 263. The discriminatory-intent analysis and heightened scrutiny applied in *JCIAM* flowed entirely through the First and Fourteenth Amendments. *Id.* at 265. In the voting-rights context, those same constitutional provisions are already addressed through the *Anderson-Burdick* framework. *See supra* p.28-30. Plaintiffs' reliance on *JCIAM* for their Twenty-Sixth Amendment claim is an unpersuasive attempt to repackage their undue burden arguments through alternative framing.

Nor do the facts of *JCIAM* provide a meaningful analogue. In addition to religious claims, *JCIAM* involved direct, explicit evidence of ethnic and racial animus: neighbors openly targeting the plaintiffs based on their African heritage, directly linked to religious affiliation. *Id.* at 259-60, 264. Nothing comparable exists here. The overt, unambiguous animus driving the *Arlington Heights* analysis in *JCIAM* bears no resemblance to the attenuated age-based motivation theories Plaintiffs ask this Court to scrutinize under that same framework.

Plaintiffs assert that "textual congruence" between the Twenty-Sixth Amendment and the Fifteenth and Nineteenth Amendments requires importing

*Arlington Heights* wholesale. Br.24-25. But textual similarity is inadequate to support the claim that a doctrine calibrated for inherently suspect characteristic discrimination should be applied in a context involving non-suspect classifications like age. The Fifteenth and Nineteenth Amendments protect the suspect or quasi-suspect characteristics of race and sex, which can be used to identify a coherent, unchanging class and measure discriminatory purpose against it.[23] Age is categorically different. Every young voter will, with the passage of time, age out of that cohort.[24]

Even assuming a textual parallel, the district court observed how the Seventh Circuit in *Tully* contrasted the Fifteenth Amendment's complete prohibition " distinction[s] based on race," with the Twenty-Sixth Amendment, which "falls short of prohibiting all age-based distinctions." JA94 (citing *Tully*, 78 F.4th at 382-83). The "emerging consensus" Plaintiffs invoke, Br.25,

---

[23] Recent Supreme Court decisions demonstrate reticence to expand the definition of sex to imparting quasi-suspect classification protections to instances where parties seek to treat sex or gender as mutable. *Cf. W. Virginia v. B. P. J. by Jackson*, No. 24–38, 609 US __, 2026 WL 1868739, at *7 (U.S. June 30, 2026); *United States v. Skrmetti*, 605 U.S. 495, 516-17 (2025). This reinforces the conclusion that age, which is mutable over time, is not intended for heightened protections.

[24] Notably, more than two years' worth of voters for whom Plaintiffs supposedly brought this case have since aged out of Plaintiffs' "class."

amounts to a handful of district court decisions this Court has never endorsed, and one its precedent casts doubt on.[25]

Plaintiffs also invoke the Twenty-Sixth Amendment's legislative history. But that history confirms only what the text says: the franchise is extended to voters 18 and older. It says nothing about the standard of proof for claims arising under it, especially those involving an unwieldy purported class of "young" or "college" voters.

Defendants maintain that *Anderson-Burdick* is the correct standard for Twenty-Sixth Amendment claims. As explained *supra*, the UMP imposes at most a minimal, justified burden and therefore cannot constitute a Twenty-Sixth Amendment violation under that framework. Plaintiffs' failure to address *Anderson-Burdick* for this claim both at trial, JA105 n.22, and in their opening brief constitutes waiver, warranting affirmance. *See Grayson O Co. v. Agadir Int''l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). However, this Court need not resolve

[25] Plaintiffs cite *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018), and *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016), *rev'd in part on other grounds, Luft*, 963 F.3d at 673. *Detzner* relied on *Thomsen* and *Lee*. As observed on appeal, the *Thomsen* plaintiffs "contested almost every feature of state law under almost every line of argument," and the appellate court declined to revisit that choice. *Luft*, 963 F.3d at 673. As stated above, *Lee* did not affirm a standard for evaluating Twenty-Sixth Amendment claims. *Lee*, 843 F.3d at 607.

the applicable standard because Plaintiffs' claim independently fails under *Arlington Heights*.

### B. The District Court Properly Rejected Plaintiffs' Twenty-Sixth Amendment Claim Under *Arlington Heights*.

Plaintiffs litigated their Twenty-Sixth Amendment claim exclusively under *Arlington Heights*. *See* Br.23-54; JA105 n.22. Without adopting that framework as controlling, the district court applied it for purposes of a complete analysis. Plaintiffs lost on every factor. JA95-105. Plaintiffs now ask this Court to reweigh credibility determinations without engaging each factor. That invitation should be declined.

#### i. Plaintiffs Cannot Define a Cognizable Voter Class.

Without a coherently defined class, there is no baseline against which to measure discriminatory purpose or disproportionate impact, and the *Arlington Heights* inquiry cannot proceed. Logically, before determining discrimination has occurred, the Court must know who has allegedly been discriminated against. *See Arlington Heights*, 429 U.S. at 266. A Twenty-Sixth Amendment claim likewise requires identifying a cognizable class who's right to vote was restricted "on account of age." U.S. Const. amend. XXVI, § 1. Plaintiffs' purported class of "young voters" has no fixed membership; it continuously empties and refills with a new cohort of individuals who were not among the

original group allegedly impacted. This structural transience makes it impossible to define a cognizable class or measure discriminatory impact against it.

Plaintiffs' definition of "young voters" was a moving target throughout this litigation. Grumbach's opening report oscillated between voters under 35, 18-24, and of undefined age; it was not until his rebuttal report that he settled on a range of 18-25, conveniently, the range in Plaintiffs' complaint. *Compare* JA1971 Fig. 6 and 1972 Fig. 7 *with* JA1991; JA46. The district court correctly found that definition "completely arbitrary" and not "based on any articulable standard." JA48. Defendants' expert, Taylor, confirmed as much, noting that ranges of 18-20 (the original target of the Twenty-Sixth Amendment), 18-24, and 18-29 (common commercial groupings) are as defensible as the 18-25 range Grumbach ultimately adopted. JA2180-2182.

Plaintiffs attempt to minimize the definitional problem. But defining the class is not a formality. How heavily a law bears on a group necessarily depends on how that group is defined, and an arbitrary definition yields an arbitrary impact analysis. Plaintiffs' own expert illustrated this. Grumbach used "young voters" as shorthand for "college voters" throughout his analysis, yet those groups are simultaneously over- and under-inclusive. JA1969, JA99. Many voters aged 18-25 have never attended college, some college voters are older than

25, and the legislative process at issue focused on statewide administration of SDR, not on any age-defined subgroup of SDR users. JA99.

Plaintiffs counter that using college students as a proxy for young voters is acceptable because the fit is "sufficiently close." Br.26-27 (citing *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992)). *McWright* only bars facially neutral classifications as substitutes for protected characteristics to evade prohibitions on intentional discrimination. 982 F.2d at 228. It does not authorize defining a protected class through a demographic proxy. More fundamentally, *McWright's* proxy examples involved involuntary manifestations of the protected characteristic, for example, gray hair as a biological consequence of aging. *Id*. But 18-to-25-year-olds do not become college students by virtue of their age, they become students by enrolling.

The cases Plaintiffs string-cite as "routinely" accepting such approximation, challenged laws facially targeting student voters: *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749 (M.D. Tenn. 2015) (university-issued photo ID); *Detzner*, 314 F. Supp. 3d 1205 (on-campus polling site); *United States v. State of Tex.*, 445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) (dormitory student registration); *One Wisconsin Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958 (W.D. Wis. 2016) (challenge including removal of high school registration options).

The UMP does not target any age group. It applies uniformly to all SDR users spanning all ages. If any age skew exists in SDR usage it is incidental to the mechanism's administrative purpose, not a product of legislative design. The district court's unchallenged finding that neither Senator Daniel nor Representative Mills "viewed nor had any understanding of age-related or demographic data around SDR usage," settles the matter. JA37. A legislature unaware of the demographic composition of SDR users could not have targeted any demographic component of that population. JA1039-1040, JA1114.

#### ii. The District Court Faithfully Applied Every *Arlington Heights* Factor.

Because the district court applied *Arlington Heights* and found for Defendants on every factor, this Court reviews those factual determinations for clear error. *United States v. Sanchez-Garcia*, 98 F.4th 90, 98 (4th Cir. 2024). There is none.

As the district court observed, *Arlington Heights* requires consideration of four factors: "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race [here, age group] than another." JA95-96 (citing *Raymond*, 981 F.3d at 303).

Plaintiffs fail to address Factor 1 in their opening brief and ignore significant findings relevant to Factors 2 and 3. Specifically, Plaintiffs do not argue that the district court erred in finding, under Factor 1, that "North Carolina has historically improved youth access to voting, not diminished it." JA96. They likewise leave unchallenged the district court's findings under Factors 2 and 3 that "[t]he General Assembly did not shorten the time for debate or impose any procedural irregularity." JA101. Arguments not raised in an opening brief are forfeited. *Grayson*, 856 F.3d at 316. Plaintiffs' only preserved arguments under *Arlington Heights* are the Mitchell-Womack attribution sub-issue embedded within Factors 2 and 3, Br.34-46, and the disproportionate-impact finding under Factor 4. Br.46-54.

Plaintiffs' overarching contention is that the district court applied the wrong legal standard within *Arlington Heights*, requiring what Plaintiffs characterize as "collective legislative intent" rather than asking whether discrimination was a "motivating factor." Br.29-33.[26] This mischaracterizes the

[26] Plaintiffs' reliance on *Louisiana v. Callais,* 146 S.Ct. 1131 (2026) (Br.30-32) is especially misplaced. First, in *Callais*, it was undisputed that "[t]he State never hid the ball" because it's "underlying goal was racial." *Id.* at 1161. Here, there was undisputedly no age data considered. JA37, JA1039-40. Second, despite having numerous legislative transcripts in front of them, the *Callais* Court, did not focus on comments by a few legislators; rather they framed the inquiry as one into the "underlying goal" of "the State" rendering Plaintiff's reliance on the Supreme Court's "if race played a role language" (which was discussed when

record. The district court did not require Plaintiffs to prove discrimination was the "sole," "predominant," or "primary" motivation. Br.30-31. It asked whether Plaintiffs had "introduced sufficient evidence for this court to conclude that such anti-youth animus should be attributed to the General Assembly." JA99. Under *Brnovich*, that inquiry requires more than showing a third party harbored discriminatory views that the Legislature declined to adopt wholesale. *Brnovich*, 594 U.S. at 689-90. Because legislators are not "agents of the bill's sponsor or proponents," *id.*, an advocate's intent does not automatically become a legislative motivating factor simply because legislators received their proposals. The district court faithfully applied this principle. JA102.

**a. Factor 1.**

The first *Arlington Heights* factor examines the decision-making body's historical background, including any history of discrimination. *Raymond*, 981 F.3d at 303. Plaintiffs contest none of the following.

North Carolina was among the first states to ratify the Twenty-Sixth Amendment in 1971. JA2183, JA96. Since ratification, the State has adopted statutes and practices designed to increase youth voter participation, including preregistration at age 16, polling sites at UNC System college campuses during

framing the Supreme Court's previous jurisprudence, not in the section setting forth new law) especially tenuous.

early voting, and acceptance of most student IDs for photo identification. JA2183-2189. On top of a 340-day traditional registration window, exceeding federal requirements by five days, these measures demonstrate the opportunity afforded to young voters to register and cast a ballot. JA74-76. Taylor highlighted that youth voter registration at North Carolina universities exceeded the national average by 6.5% in 2020. JA2185-2186. The district court found—and Plaintiffs do not contest—that "North Carolina has historically improved youth voting, not diminished it." JA98.

**b. Factors 2 and 3.**

The second and third *Arlington Heights* factors examine the specific sequence of events and legislative history, including "any significant departures from normal procedures." *Raymond*, 981 F.3d at 303.

Following the 2022 midterm elections, Senator Daniel and his co-chairs received more than seventy-five policy recommendations regarding election integrity from a range of individual constituents and groups, NCEIT among them. JA39, JA995-96, JA1037. Plaintiffs do not dispute this. Br.19,37. Reflecting the volume of constituent interest in election reform, SB 747 was filed on June 1, 2023, sent through Senate committee on June 15, and crossed to the House on June 22. JA1634-1636. After receiving input from the NCSBE and lobbying by Plaintiffs, a House Proposed Committee Substitute was offered

following a committee hearing on August 15. JA953-954, JA1102-1103, JA1633-1634. During the committee meeting, several amendments were heard and debate was not limited. Representative Mills testified that the committee ran over its allotted time, and he had to obtain special permission to extend the meeting. JA1114. The House Committee Substitute passed both chambers and became law on October 10, 2023. JA1627. Throughout this process, no bill sponsor reviewed age-related data about SDR. JA1039-1040. Both bill handlers testified that the standard legislative process was followed. JA1038-1039, JA1115. Plaintiffs identify no procedural abnormalities. There were none.

At its core, Plaintiffs' Twenty-Sixth Amendment claim rests on a single proposition: election integrity advocates Mitchell and Womack harbored anti-youth animus, and the Legislature acted on that animus by restructuring SDR in SB 747. Br.34. The district court properly rejected that attenuated theory under *Brnovich*.

First, the district court found that Mitchell and Womack's opposition to SDR was not age-based. JA38-39. Both opposed SDR "in all instances, regardless of who used SDR or for whom SDR users tended to vote," and were "ultimately disappointed in SB 747's changes to the SDR mail verification scheme." *Id*. Plaintiffs emphasize Womack's "pejorative[s]" about young

voters. Br.40.[27] But colorful rhetoric from a third-party activist whose preferred policy never became law does not carry Plaintiffs' burden.

At any rate, Womack testified that he opposed SDR "under any circumstance," without regard to the age or identity of the voters using it. JA1133, JA1138. Mitchell testified she opposed SDR not because of its use by college students or any particular group, but simply "because you cannot properly verify the registration when it's happening at the same time as voting." JA198-199; JA22-23, JA99. Representative Mills testified that he did not intend to target college voters or voters aged 18-25. JA1114. Senator Daniel testified similarly. JA1039-1040. The district court heard this testimony and found that neither Mitchell nor Womack was motivated by age-based animus, and neither was the Legislature. JA38-39, JA99. That credibility determination should not be reweighed. *Charleston Cnty.*, 365 F.3d at 349.

Plaintiffs argue that targeting a purported class "to preserve legislative power in a partisan manner" can be discriminatory. Br.41. This argument was not raised below and there is no evidence of this in the record.[28] Even if that

---

[27] Womack testified that he believed "we bend over backwards to make sure college students can vote in North Carolina," observing that they are among a select class of voters with potentially multiple options of where to register to vote. JA1127-1133.

[28] At most, Plaintiffs questioned Mitchell about her partisanship. JA752. But as Mitchell unequivocally testified, she is against SDR regardless of who uses it. JA740-741. Plaintiffs failed to offer any evidence concerning the political

were true here—which it is not—SDR restrictions motivated by partisan concerns would not violate the Twenty-Sixth Amendment, which prohibits discrimination "on account of age," not on account of political preferences that may incidentally correlate with youth.[29]

Second, neither Mitchell's nor Womack's preferred outcomes became law. They sought SDR's elimination. JA1113, JA783. When that proved "mission impossible," they advocated that SDR ballots be treated as provisional. JA1138-39. Neither happened. Mitchell met once with Senator Daniel but "never heard a word" from any legislator regarding her offer of assistance thereafter. JA31-32. The bill, filed on June 1, 2023, treated SDR ballots as provisional. JA1755. But when it crossed to the House, Representative Mills incorporated the NCSBE's recommendation to remove that requirement and substitute it for the single-mailer, retrievable-ballot system.[30] JA1064. Both Mitchell and Womack expressed open disappointment with the bill's final form.

---

attitudes of young North Carolinians. JA46, JA1345-1346. National attitudinal data cannot establish that a North Carolina voting regulation discriminates against a North Carolina voter class, however defined.

[29] It is well established that to challenge an electoral system's constitutionality, a party must "disentangle" the alleged protected class from politics to prove the legislature was motivated by an improper purpose as opposed to partisanship. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024) (requiring race and politics be disentangled); *Callais*, 146 S. Ct. at 1156-57.

[30] Democracy NC also lobbied to change the provisional ballot requirement. JA953-954.

JA200-202, JA1173; JA39. This is unsurprising since Representative Mills never met with Mitchell and had only one unmemorable interaction with Womack, while specifically seeking input from the NCSBE. JA1108-1110, JA1113.

Third, the UMP as enacted did not originate with Mitchell or Womack. It originated with the NCSBE. JA33-35. As early as 2016, the NCSBE identified an administrative problem with SDR in a Numbered Memo, the second verification card for SDR users frequently returned undeliverable after county canvass, with no mechanism to retrieve the associated ballot. JA106, JA1762-1765. After SB 747 passed to the House, Representative Mills contacted the NCSBE for input. JA1096. The NCSBE then recommended the single-mailer, retrievable-ballot mechanism as a more administrable and less impactful alternative to provisional ballots. JA1937-1938. This recommendation was incorporated into the House substitute and ultimately the final law. JA36. The NCSBE's input provides an independent, facially neutral basis for the enacted mechanism, entirely apart from anything Mitchell or Womack said or wanted.[31]

---

[31] As explained *infra*, Plaintiffs' factual argument for ignoring the NCSBE's involvement because the NCSBE did not start the legislative change is a red herring. The Legislature decided to make a policy change, sought the NCSBE's guidance on administrative feasibility, and implemented that guidance. JA1096-1097. That sequence does not taint a facially neutral, administratively driven recommendation with discriminatory purpose.

Plaintiffs argue that the NCSBE's recommendation does not constitute a truly "independent" source for the UMP because the NCSBE "engaged in the legislative process only after Mitchell and Womack successfully transformed the restriction of SDR into a non-negotiable feature of SB 747." Br.44-45. This argument inverts the constitutional inquiry. The question is not who gets credit for prompting legislative attention to SDR, it is whether the specific mechanism enacted was the product of discriminatory intent. *Brnovich*, 594 U.S. at 687-89. The NCSBE's proposal—what became law—was grounded in administrative concerns about the bill's initial draft. JA106. Yet Plaintiffs' theory would render illegitimate any independent administrative recommendation following lobbying activity, a principle neither *Arlington Heights* nor *Brnovich* supports.

Plaintiffs further contend that this case is distinguishable from *Brnovich's* cat's paw analysis because Mitchell and Womack were "invited into" the legislative process rather than infiltrating it surreptitiously. Br.44-45. Putting aside the mischaracterization of the record, that distinction proves nothing. *Brnovich's* holding is not limited to cases where a lobbyist acted under false pretenses. Its point is that legislators exercise independent judgment regardless of how they came to hear from an outside advocate. 594 U.S. at 689-90. That Senator Daniel attended one meeting with Mitchell and Womack prior to SB 747's filing does not mean that meeting governed his vote.

In *Brnovich*, the Supreme Court affirmed the district court's finding of no discriminatory purpose in Arizona's ballot-collection restriction. 594 U.S. 647. Although the law's enactment followed increased use of ballot collection as a Democratic get-out-the-vote strategy and unfounded allegations of fraud by one state senator, the district court found that the sincere legislative debate those events sparked was not imbued with discriminatory motive. The Supreme Court agreed. *Id*. at 688-89. Rejecting the Ninth Circuit's cat's paw theory, the Court held that "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents" and "have a duty to exercise their judgment and to represent their constituents" and it is "insulting" to suggest they may be duped by a few advocates' input. *Id*. at 689-90.

Plaintiffs insist that "the one plausible factual inference" from the record is that SDR restrictions were included in SB 747 because Mitchell and Womack requested them. Br.38. That argument ignores the constitutional presumption of legislative good faith, *Abbott v. Perez*, 585 U.S. 579, 607 (2018), and *Brnovich's* categorical principle that the cat's paw theory "has no application to legislative bodies." 594 U.S. at 689. It also ignores that the Legislature received over seventy-five recommendations for election law changes, deliberated for months, and ultimately enacted a mechanism recommended by the NCSBE, changes which made Mitchell and Womack unhappy. This record amply supports the

district court's finding that the Legislature acted for legitimate, age-neutral reasons. Whatever influence Mitchell and Womack hoped to exert, the district court correctly found that the legislators "carried out their 'duty to exercise their judgment and to represent their constituents.' " JA100 (citing *Brnovich*, 594 U.S. at 689-90). *Brnovich* requires drawing the inference that cuts in the Legislature's favor when the evidence plausibly supports multiple conclusions. *Alexander*, 602 U.S. at 10. The district court did so, and there is no clear error.

Plaintiffs rely heavily on *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025), Br.43-44, but that case confirms why their theory of influence fails. In *Mi Familia*, the House Speaker referred to the challenged bill as "their bill" (meaning the outside advocacy group's), the group's representative "testified to the details of the bill as the Senate Government Committee's expert witness," and the bill's sponsor "deferred to [the representative] when asked questions about the bill in a committee hearing," telling committee members he had been "working with [the group] on this bill, and they've spent hundreds of hours digging into this." 129 F.4th at 727. None of that is present here.

At most, NCEIT claimed credit for some unchallenged provisions of SB 747 in a self-serving press statement that falls far short of a legislative sponsor

crediting or deferring to an outside group.[32] JA2111-2113. More tellingly, Representative Mills was unfamiliar with NCEIT when he assumed responsibility for the bill in the House. JA1062-1063. And Senator Daniel described the SDR provision of enacted SB 747 as "commonsense" and a straightforward response to constituent concerns about mail verification timing. JA1029-1030. In SB 747 as passed, Mitchell and Womack got none of what they asked for. The district court correctly held that this case "is much like *Brnovich*," not *Mi Familia*. JA102-103.

**c. Factor 4.**

Disproportionate impact, the final *Arlington Heights* factor, also favors Defendants. The district court found that SB 747 "does not bear more heavily on young voters" for two independently dispositive reasons: young voters are not worse off under SB 747's notice-and-cure process than they were under the prior two-card regime, and any claimed disparity involves "only insubstantial numbers" of affected voters. JA67. Both findings are supported by the record.

The only expert to conduct a proper comparative disparate-impact analysis was defense expert, White. *Supra* p.17-18. He compared the actual number of denials among younger SDR users to the number that would be

[32] The district court specifically noted Womack's testimony that he was not consulted on the post, which he considered "braggadocious." JA33.

expected if denials were distributed proportionally across age groups, using statistical significance tests appropriate to the data. Across all elections and all counties in the relevant period, the aggregate difference in denial rates between registrants aged 18-25 and those 26 and older was not statistically significant. JA2236, Table 8. Of 225 individual analyses comparing the two age groups at varying levels of aggregation, only six were statistically significant—and of those, four reflected outcomes adverse to older registrants, not younger ones. *Id*. Most tellingly, there were zero statistically significant results in the 2024 elections—the first conducted under SB 747. JA2237. If SB 747 bore more heavily on young voters, that disparity should have appeared in 2024. It did not.

The 2024 election results confirm White's analysis. Youth voter turnout increased after SB 747's enactment. JA83-84. Youth SDR usage rates remained stable. JA103-104. Denial rates for young voters after SB 747 fell within the historical range of pre-SB 747 denial rates, leading White to conclude there was "no discernible difference post-SB 747 in the ultimate outcome for these voters than it was before SB 747 when the second mailer was in place." JA1479.

Plaintiffs' expert Quinn's analysis was materially undermined by programming errors that substantially altered his conclusions between his reports. The number of voters he found to rely on the second verification card dropped by 25% (from 60,000 to 45,000), and his reported success rate for the

second mailer fell from 55% to 28%. *Compare* JA2033 *with* JA2082; JA65-66. Plaintiffs contend these discrepancies reflect methodological differences rather than error. Br.46-47, n.11. But using the same data source does not rehabilitate Quinn's outputs. And mischaracterizing *Brnovich's* rejection of disparate-impact analysis in the VRA §2 context does not help either. Tellingly, Quinn admitted to multiple errors in his own work. JA808-811, JA860-861, JA1501-1503. The district court evaluated each expert's analytical choices and found White's more reliable. JA66. That credibility determination belongs to the district court. *Charleston Cnty.*, 365 F.3d at 349.

Plaintiffs place significant weight on the statistic that young voters made up 40.4% of those who entered the notice-and-cure process in the 2024 General Election and that 465 voters aged 18-25 had their ballots rejected compared to 656 voters aged 26 and older. Br.48-49. These figures are less probative than they appear. They measure only who entered and failed the cure process, not whether young voters navigate the cure process at a statistically different rate than older voters. That is the constitutionally relevant comparison, and White ran 225 analyses across multiple elections. JA2218, JA2236-2238. Of those, zero showed statistically significant adverse impact on younger voters in 2024. JA2237. Plaintiffs' raw numbers, divorced from comparative statistical analysis, are

precisely the "small differences" the Supreme Court cautioned against "artificially magnify[ing]." *Brnovich*, 594 U.S. at 671.

Plaintiffs argue the district court erred by using a "strictly temporal method," evaluating youth voter outcomes before and after SB 747 rather than comparing how youth voters fared relative to older voters under both schemes. Br.49-51 (citing *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016); *Coal. For TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864 (4th Cir. 2023)). This mischaracterizes the record. White's analysis was precisely the cross-group comparative methodology Plaintiffs demand. He tested whether younger registrants were denied at statistically different rates than older registrants across 225 separate analyses covering multiple elections and counties. JA2236-2238. The district court premised its finding on that comparative analysis, JA67-73, and did exactly what *McCrory* and *Coal. for TJ* require: it evaluated the impact on one group both over time and relative to others.

Plaintiffs also contend that the district court erred by considering other available voting options when assessing the impact of SB 747. Br.51-52 (citing *McCrory*, 831 F.3d at 230). But *McCrory* addressed a challenged law affecting a racial minority's access to the franchise, including eliminating SDR. 831 F.3d at

216-17.[33] Here, the UMP applies to one optional registration method, and the only burden Plaintiffs establish is that some SDR users' first verification card is returned as undeliverable—a burden White found statistically indistinguishable between age groups. JA1479-1480. Considering the full electoral context is not discounting a burden, it faithfully applies precedent. *See supra* p.23-26.

Finally, Plaintiffs contend that the notice-and-cure process is "an incomplete solution at best" because approximately 72% of voters who entered the cure process had their ballots rejected. This is the same failure rate as the pre-SB 747 second mailer. Br.53-54. This comparison is misleading in two respects.

First, Plaintiffs treat the notice-and-cure process as a temporary patch when it is actually a permanent component of the legal landscape. The *Voto Latino* consent judgment permanently enjoins the NCSBE from removing any SDR voter's ballot without first providing notice and a meaningful opportunity to cure. JA5. The UMP must be assessed as it actually operates, including all applicable legal requirements. *Pisano*, 743 F.3d at 933.

Second, the raw 72% cure-failure rate proves nothing about disparate impact unless that rate differs between younger and older voters. White

[33] In *McCrory,* the Legislature "requested and received racial data." 834 F.3d at 216. The opposite is true here. JA37, JA1039-1040. This renders Plaintiffs' repeated reliance on *McCrory* inapposite.

compared exactly that. His finding of zero statistically significant differences in the 2024 elections conducted under SB 747 with the cure process in place directly answers the question. JA2237. Plaintiffs' reliance on absolute cure-failure rates, unmoored from any comparative analysis, cannot establish that SB 747 "bears more heavily" on young voters than on older ones.

#### iii. Even if Plaintiffs Demonstrated the *Arlington Heights* Factors, SB 747 Would Have Been Enacted Regardless.

Proof of a discriminatory motivating factor under *Arlington Heights* "would not necessarily have required invalidation of the challenged decision." 429 U.S. at 270 n.21. Instead, it shifts the burden to the law's defenders to show "that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* This Court need not reach step two because Plaintiffs have not carried step one. But the record independently establishes that SB 747's SDR provisions would have been enacted regardless.

The NCSBE—as an independent administrative body with no plausible or alleged animus—recommended the specific one-mailer mechanism that became law, grounded in identified administrability concerns with the Senate's initial version of SB 747, entirely independent of Mitchell, Womack, or NCEIT. JA1193, JA1937-1938; JA33-37, JA106. The final bill's shift from provisional ballots to a single mailer and retrievable ballot demonstrates that the enacted

UMP reflects the Legislature's adoption of the NCSBE's administrative judgment, not other third-party advocacy. JA35-37.

The constituent demand for election reform was widespread. JA996, JA1006-07, JA1019-20, JA1037, JA1108-09. Senator Daniel received over seventy-five recommendations from a range of groups beyond NCEIT and described SDR as a constituent issue he would have addressed through the legislative process regardless of who raised it. JA1006, JA995-96. The Legislature's response to that broadly based constituent demand would have produced legislative action on election reform with or without Mitchell and Womack's efforts. Plaintiffs do not dispute this.

## CONCLUSION

For the above stated reasons, the district court's judgment should be affirmed.

July 23, 2026. Respectfully submitted,

*/s/ Phillip J. Strach*
Phillip J. Strach
Alyssa M. Riggins
Cassie A. Holt
Jordan A. Koonts
Kacie T. England
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
301 Hillsborough St., Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800

*/s/ Mary L. Lucasse*
Mary L. Lucasse
Mary W. Scruggs
Special Deputy Attorneys General
**NC DEPARTMENT OF JUSTICE**
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6400
mlucasse@ncdoj.gov
mscruggs@ncdoj.gov

phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com
kacie.england@nelsonmullins.com

*Counsel for Intervenor Legislative Defendants-Appellees*

*Counsel for State Board of Elections, Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of FRAP 32(a)(7)(B) because it contains 12,896 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of FRAP 32(a)(5) because it has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Calisto MT font.

July 23, 2026.

*/s/ Phillip J. Strach*
Phillip J. Strach
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
301 Hillsborough St., Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system, which will send a copy of the same to all counsel of record in this matter.

July 23, 2026.

*/s/ Phillip J. Strach*
Phillip J. Strach
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
301 Hillsborough St., Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com