No. 26-1532

# United States Court of Appeals for the Fourth Circuit

---

DEMOCRACY NORTH CAROLINA, *et al.*,

*Plaintiffs–Appellants*,

v.

FRANCIS X. DE LUCA, *et al.*,

*Defendants–Appellees*,

and

PHILIP BERGER, *et al.*,

*Intervenors–Appellees*.

---

On Appeal from the United States District Court
for the Middle District of North Carolina
No. 1:23-cv-878

---

**BRIEF OF REPUBLICAN NATIONAL COMMITTEE
AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES**

---

Gilbert C. Dickey
Conor D. Woodfin
James E. Marmaduke
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd.
Suite 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com

July 30, 2026                    *Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  26-1532          Caption:  Democracy North Carolina v. Francis De Luca

Pursuant to FRAP 26.1 and Local Rule 26.1,

Republican National Committee
(name of party/amicus)

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐YES ☑NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gilbert C. Dickey               Date:     July 30, 2026

Counsel for: Republican National Committee

TABLE OF CONTENTS

Table of Authorities ....................................................................... ii

Interest of *Amicus Curiae* ............................................................ 2

Introduction .................................................................................. 3

Argument ...................................................................................... 5

   I.    Limited guardrails on same-day registration do not violate the
        Constitution under *Anderson-Burdick*. .................................... 6

       A.   SB 747 does not burden the constitutional right to vote. ............ 7

       B.   Even if *Anderson-Burdick* applies, the verification-and-cure rule
           imposes at most a minimal burden. ........................................... 11

           1.   The rule's burden is the cost of compliance, not the
               consequence of noncompliance. ........................................... 12

           2.   Most voters are not burdened at all by SB 747, and any
               burden on those affected is de minimis at most. ................ 14

           3.   North Carolina's strong interests justify the minimal
               burden. ................................................................................ 18

  II.   The district court correctly rejected Plaintiffs' Twenty Sixth
        Amendment claim. ...................................................................... 19

Conclusion ..................................................................................... 22

Certificate of Compliance .............................................................. 24

Certificate of Service ..................................................................... 25

**Cases**

*Alexander v. S.C. State Conf. of the NAACP,*
602 U.S. 1 (2024) ........................................................................ 21

*Am. Party of Tex. v. White,*
415 U.S. 767 (1974) .................................................................... 10

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) .................................................................... 12

*Ariz. Democratic Party v. Hobbs,*
18 F.4th 1179 (9th Cir. 2021) .................................................... 13

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ................................................... 4, 20, 22

Barilla v. Ervin,
886 F.2d 1514 (9th Cir. 1989) ..................................................... 8

*Brnovich v. DNC,*
594 U.S. 647 (2021) ................................................... 7, 16, 20

*Burns v. Fortson,*
410 U.S. 686 (1973) ...................................................................... 7

Buscemi v. Bell,
964 F.3d 252 (4th Cir. 2020) ..................................................... 16

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.,*
68 F.4th 864 (4th Cir. 2023) ..................................................... 22

*Cooper v. Aaron,*
358 U.S. 1 (1958) ....................................................................... 10

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008) ................................. 3, 4, 6, 11, 12, 13, 14, 15, 16, 18, 19

Democracy N.C. v. N.C. State Bd. of Elections,
476 F. Supp. 3d 158 (M.D.N.C. 2020) ....................................... 8

Diaz v. Cobb,
541 F. Supp. 2d 1319 (S.D. Fla. 2008) ........................................ 8

*Harlan v. Scholz,*
866 F.3d 754 (7th Cir. 2017) .......................................................................... 17

*Harper v. Va. State Bd. of Elections,*
383 U.S. 663 (1966) ....................................................................................... 10

*Kim v. Bd. of Educ. of Howard Cnty.,*
93 F.4th 733 (4th Cir. 2024) ........................................................................... 9

*Lee v. Va. State Bd. of Elections,*
843 F.3d 592 (4th Cir. 2016) ..................................................................... 5, 19

*Libertarian Party of Va. v. Alcorn,*
826 F.3d 708 (4th Cir. 2016) ......................................................................... 19

*Marston v. Lewis,*
410 U.S. 679 (1973) .................................................................................. 6, 7, 9

*Mays v. LaRose,*
951 F.3d 775 (6th Cir. 2020) ......................................................................... 19

*Mazo v. N.J. Sec'y of State,*
54 F.4th 124 (3d Cir. 2022) ........................................................................... 16

*McDonald v. Bd. of Election Comm'n,*
394 U.S. 802 (1969) ............................................................................. 6, 10, 11

*Mi Familia Vota v. Fontes,*
129 F.4th 691 (9th Cir. 2025) ....................................................................... 21

*N.C. State Conf. of the NAACP v. Raymond,*
981 F.3d 295 (4th Cir. 2020) ......................................................................... 21

*New Ga. Project v. Raffensperger,*
976 F.3d 1278 (11th Cir. 2020) ..................................................................... 15

*O'Brien v. Skinner,*
414 U.S. 524 (1974) ....................................................................................... 11

*Ohio Democratic Party v. Husted,*
834 F.3d 620 (6th Cir. 2016) ......................................................................... 17

*Org. for Black Struggle v. Ashcroft,*
978 F.3d 603 (8th Cir. 2020) ......................................................................... 13

*Pisano v. Strach*,
743 F.3d 927 (4th Cir. 2014)...................................................................... 12

*Pullman-Standard v. Swint*,
456 U.S. 273 (1982) .................................................................................... 19

*Reynolds v. Sims*,
377 U.S. 533 (1964) .................................................................................... 14

*Richardson v. Tex. Sec'y of State*,
978 F.3d 220 (5th Cir. 2020)...................................................................... 13

*Rosario v. Rockefeller*,
410 U.S. 752 (1973) ...................................................................................... 7

Rutgers Univ. Student Assembly v. Middlesex Cnty. Bd. of Elections,
141 A.3d 335 (N.J. Super. Ct. App. Div. 2016) ......................................... 9

*S.C. Green Party v. S.C. State Election Comm'n*,
612 F.3d 752 (4th Cir. 2010)...................................................................... 19

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
411 U.S. 1 (1973) ......................................................................................... 3

*Tex. Democratic Party v. Abbott*,
978 F.3d 168 (5th Cir. 2020)...................................................................... 20

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) ..................................................................................... 3

*Tully v. Okeson*,
78 F.4th 377 (7th Cir. 2023) ...................................................................... 20

**Statutes**

U.S. Const. art. I, §4, cl. 1 ............................................................................... 3

U.S. Const. art. II, §1, cl. 2 .............................................................................. 3

**Other Authorities**

N.C. Gen. Stat. §163-230.1............................................................................. 15

N.C. Gen. Stat. §163-82.6B ................................................................ 3, 4, 8, 9, 14

**Rules and Regulations**

Fed. R. App. P. 29.................................................................................. 2

The Republican National Committee (RNC) is a political organization that helps its members achieve electoral victories at the local, state, and national level, and that works to ensure a fair and equal electoral process. The RNC is a national political party that represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the territories. To further its mission, the RNC raises and spends funds to support Republican candidates across the nation, and it engages in a wide range of party-building activities, including voter registration, persuasion, and turnout programs.

The RNC has vital interests in protecting the constitutional and statutory rights of Republican voters and Republican candidates. It also has interests in ensuring that States follow election procedures, in particular those set by the U.S. Constitution and federal law.

No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution toward the preparation or submission of this brief. All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

The Constitution grants States broad authority to set election rules, *see* U.S. Const. art. I, §4, cl. 1; *id.* art. II, §1, cl. 2, and recognizes that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). That authority operates alongside the right to vote, which ensures a right to participate "on an equal basis with other qualified voters," *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973), free from rules imposing "a severe and unjustified overall burden upon the right to vote," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 208 (2008) (Scalia, J., concurring in the judgment).

North Carolina is one of about twenty-four States that offer same-day voter registration.* The North Carolina General Assembly enacted SB 747 to address a timing problem in same-day registration. During the State's early voting period, an unregistered voter can register, prove residence by presenting a qualifying document, and cast a retrievable ballot; officials then mail a verification card to the voter's listed address. N.C. Gen. Stat. §163-82.6B(a)-(c), 163-82.7(c). Under the former regime, officials would send a second verification card if the first returned as undeliverable; if the second

---

* Nat'l Conf. of State Legislatures, *Same-Day Voter Registration* (Mar. 27, 2026), www.ncsl.org/elections-and-campaigns/same-day-voter-registration [perma.cc/ZZP7-SP49].

was still outstanding at canvass, officials counted the ballot without knowing whether it too would be returned. SB 747 instead permits officials to decide before canvass whether to count a ballot when the first verification card is returned undeliverable. *Id.* §163-82.6B(d). Yet even an undeliverable verification card does not automatically disqualify the ballot. Rather, officials check for data-entry errors and notify the voter, who can cure with a qualifying document or in-person verification. If the address-verification returns too late to allow cure, the ballot remains counted. JA17-20.

This is a straightforward case under *Anderson-Burdick*, which weighs the rule's burden against the State's justifications. *Crawford*, 553 U.S. at 190 (plurality op.). The district court agreed, and after a five-day bench trial, found no material increase in the rate at which same-day ballots were rejected and no showing that same-day voters were meaningfully more likely to have ballots wrongly excluded. It therefore held that any burden was minimal and justified by the State's interest in election integrity. JA83-89, 107.

The Twenty-Sixth Amendment claim fares no better. Plaintiffs ask this Court to import the racial-intent framework of *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), into unsettled Twenty Sixth Amendment law. No precedent requires that extension, and it is "far from clear" that the Twenty-Sixth Amendment imports Fifteenth Amendment

4

principles. *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 607 (4th Cir. 2016). But the claim fails even under Plaintiffs' preferred test. The district court found that the State historically expanded young voters' access, that the legislative process rejected more restrictive proposals, and that SB 747 did not worsen young voters' denial rates. That record does not show discriminatory intent. JA93-104. This Court should affirm.

**ARGUMENT**

Neither of Plaintiffs' constitutional claims warrant reversal. First, their *Anderson-Burdick* claim fails because SB 747 does not burden the constitutional right to vote. The law leaves North Carolina's ordinary registration avenues untouched and regulates only same-day registration— a supplemental option that the Constitution does not require. Rational-basis review therefore applies, and SB 747 readily survives it. Even under a stricter standard, the challenged safeguard imposes at most a limited, contingent, and remediable burden amply justified by the State's interests in verifying residence and completing an accurate and timely canvass.

Second, Plaintiffs' Twenty-Sixth Amendment claim fails because SB 747 is age neutral, applies alike to every same-day registrant, and was enacted for legitimate election-administration purposes. Young voters' greater use of same-day registration—or the views of private advocates— are not proof that age discrimination motivated the General Assembly,

particularly in light of the presumption of legislative good faith and the district court's factual findings.

## I. Limited guardrails on same-day registration do not violate the Constitution under *Anderson-Burdick.*

The Constitution does not require same-day registration. Roughly half the States in the country don't offer it at all. *See supra*, note*. North Carolina permits voters to register through ordinary channels until the regular deadline (25 days before an election), and then extends an additional registration opportunity during early voting. The Supreme Court has already blessed a 50-day registration cutoff, holding that a citizen "does not have a federal constitutional right to arrive at the polls on election day and demand a ballot." *Marston v. Lewis*, 410 U.S. 679, 680-82 (1973) (per curiam). North Carolina could eliminate same-day registration entirely without offending the Constitution. *See id.* North Carolina's modest safeguards thus do not concern the right to vote at all. *See McDonald v. Bd. of Election Comm'n*, 394 U.S. 802, 807-09 (1969). In any event, even if *Anderson-Burdick* applied, the claim fails because Plaintiffs allege only de minimis burdens on a handful of voters facing unique circumstances. *See Crawford*, 553 U.S. at 204-09 (Scalia, J., concurring in the judgment). And North Carolina's interests in confirming residence and completing an accurate and timely canvass justify any burden.

**A.     SB 747 does not burden the constitutional right to vote.**

Plaintiffs' claim fails at the threshold because it does not burden the right to vote. The Supreme Court has repeatedly distinguished an absolute legal barrier to the franchise from a reasonable deadline that a voter had an opportunity to meet.

The Constitution guarantees qualified citizens a reasonable opportunity to register and vote; it does not guarantee a right to postpone registration until voting is already underway. In *Marston*, the Supreme Court explained that a person has no federal constitutional right to arrive at the polls on Election Day and demand a ballot without having complied with advance-registration requirements.  It upheld Arizona's 50-day registration cutoff because States need time to prepare accurate records and protect the electoral process. 410 U.S. at 680-82. *Burns v. Fortson* similarly sustained a fifty-day cutoff supported by the State's interest in accurate voter lists. 410 U.S. 686, 686-87 (1973) (per curiam). And *Rosario v. Rockefeller* rejected a claim of disenfranchisement where the challenged law imposed a deadline that the voters could have satisfied, rather than an absolute prohibition they could not overcome. 410 U.S. 752, 756-62 (1973). The upshot is that "every voting rule imposes a burden of some sort," but the "usual burdens of voting"— including early registration—do not violate any right to vote. *Brnovich v. DNC*, 594 U.S. 647, 669 (2021) (citing *Crawford*, 553 U.S. at 198). Thus,

although a State must provide a reasonable route to registration to meet the Constitution's baseline, it need not keep registration open through the voting period.

North Carolina provides substantially more than the Constitution's minimum by preserving an additional registration opportunity after its ordinary deadline has passed. The State's civilian registration deadline is twenty-five days before Election Day, and voters may apply by mail, through the Department of Motor Vehicles, or through other voter-registration agencies. *See* N.C. Gen. Stat. §163-82.6; JA13-17. A person who misses that deadline may nevertheless register and vote at an early-voting site through same-day registration. N.C. Gen. Stat. §163-82.6B(a). That accommodation is generous—it is not constitutionally required. Indeed, twenty-five States impose an advance-registration deadline for a full ballot. *See supra*, note*. And courts have repeatedly upheld advance-registration deadlines against claims that the deadline itself unduly burdens the right to vote. *See, e.g.*, *Barilla v. Ervin*, 886 F.2d 1514, 1523-25 (9th Cir. 1989) (upholding a 20-day deadline); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 210-13 (M.D.N.C. 2020) (denying preliminary relief against North Carolina's 25-day deadline and finding the burden "modest at best"); *Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1329-35 (S.D. Fla. 2008) (upholding a 29-day deadline); *Rutgers Univ. Student Assembly v. Middlesex*

*Cnty. Bd. of Elections*, 141 A.3d 335, 342-47 (N.J. Super. Ct. App. Div. 2016) (upholding a 21-day deadline as imposing no more than a minimal burden).

SB 747 leaves voters' constitutionally sufficient opportunity to register unchanged. The law does not move the ordinary deadline forward, narrow the methods of registering before that deadline, or prevent any timely registrant from voting. *See* N.C. Gen. Stat. §163-82.6. It regulates only an applicant who invokes the State's additional post-deadline process after voting has begun. *Id.* That distinction is constitutionally significant because the State is not treating "similarly situated" would-be voters differently. *Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 740 (4th Cir. 2024). Timely registrants and same-day applicants arrive at different stages of the administrative process. A timely application can be processed, mailed, corrected, and verified before voting and canvass. A same-day application arrives on a compressed timetable and must be verified while the applicant's ballot is already being held for possible inclusion in the count. Different procedures that respond to that timing difference do not create "first-class" and "second-class" voters; they distinguish applications submitted on the ordinary timetable from applications submitted after voting has begun. *Contra* Blue Br.12-14.

Because same-day registration is an act of generosity and not a constitutional requirement, *Marston*, 410 U.S. at 680-82, Plaintiffs retreat to

the principle that an optional election procedure must still be administered in a manner *consistent* with the Constitution. *See* Blue Br.13. Their argument is a tautology. *All* government action "must be exercised consistently with federal constitutional requirements." *Cooper v. Aaron*, 358 U.S. 1, 19 (1958). Obviously, North Carolina could not offer same-day registration only to favored races, parties, or viewpoints, and it could not attach wholly arbitrary conditions to the process. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966); *Am. Party of Tex. v. White*, 415 U.S. 767, 794-95 (1974). But noting that one particular kind of government action—an optional election procedure—must be carried out constitutionally does not make that procedure a freestanding constitutional right. Nor would it establish that same-day registrants must receive every procedure afforded to timely registrants. The relevant question remains whether the State impaired a constitutionally protected opportunity to register and vote. It has not. *White*, 415 U.S. at 794-95.

*McDonald* reinforces the conclusion that SB 747 regulates an optional entitlement, not the right to vote. 394 U.S. at 807-09. *McDonald* applied ordinary rational-basis review to an absentee-ballot classification because the record did not show that the plaintiffs were "absolutely prohibited" from voting by some other means; the asserted interest was therefore not the right to vote itself, but a claimed right to receive absentee ballots. *Id.*; *cf. O'Brien v.*

*Skinner*, 414 U.S. 524, 529-30 (1974). *McDonald*'s reasoning thus confirms that when the State preserves a reasonable, generally available path to the franchise, a regulation confined to an additional statutory route does not automatically trigger heightened scrutiny.

Because SB 747 does not impair the ordinary opportunity to register and vote, traditional rational-basis review is appropriate. Under that standard, the law need only bear a rational relationship to legitimate state objectives. *McDonald*, 394 U.S. at 809. The verification rule easily does so. Indeed, North Carolina's interests track closely Indiana's interests that the Supreme Court blessed in *Crawford*: "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." 553 U.S. at 196. And the State's procedures to verify and cross-check same-day registrations directly further its interests in confirming that an applicant resides at the address associated with the ballot, detecting duplicate registrations, and ensuring "orderly administration and accurate recordkeeping." *Id.*

### B. Even if *Anderson-Burdick* applies, the verification-and-cure rule imposes at most a minimal burden.

Plaintiffs characterize the "burden" as the possibility that a ballot will not be counted. They call that consequence the "most severe burden the Constitution recognizes." Blue Br.15. But *Anderson-Burdick* requires courts to assess the "character and magnitude" of the burden imposed by the

challenged rule, *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), in the context of the State's election system as a whole, *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014). The relevant question is what the rule ordinarily requires of affected voters—not simply what happens if registration remains unverified.

Any burden imposed by SB 747 is minimal at best. Most same-day registration voters need do nothing after applying, presenting identification and proof of residence, and voting. If a verification mailing is returned, the regime provides for error checking, notice, and an opportunity to establish residence before the final count. JA19-20, JA1900-03.

### 1. The rule's burden is the cost of compliance, not the consequence of noncompliance.

Plaintiffs begin their burden analysis at the end of the registration process and reason backward from the possibility that a ballot will not be counted. *See* Blue Br.14-15. But that turns the analysis on its head. The burden is the effort required to complete registration verification, not the ultimate consequence when verification remains unresolved. *See Crawford*, 553 U.S. at 198. In *Crawford*, for example, the plurality measured Indiana's voter-identification burden by what *compliance* required: traveling to the motor-vehicle office, gathering documents, and posing for a photograph. *Id.* The plurality did not treat the law as severely burdensome merely because a voter who neither presented identification nor completed the provisional-ballot process might not have a ballot counted. *Id.* at 198-99. It asked whether

the steps needed to comply substantially exceeded "the usual burdens of voting." *Id.* at 198.

Treating non-counting as the burden would erase the "sliding scale" that *Anderson-Burdick* requires. *See* Blue Br.10. Registration deadlines, identification rules, precinct requirements, and ballot-return deadlines all may lead to non-counting, yet courts do not treat them as equally severe. *See, e.g.*, *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1187-88 (9th Cir. 2021) (distinguishing between "severe" and "lesser" burdens on voting rights). "[T]he likelihood that some ballots are likely to be rejected after the deadline does not transform the burden into one that is severe." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 608 (8th Cir. 2020). Otherwise, every mandatory voting rule, no matter how trivial the cost of compliance, would be a severe burden. *Hobbs*, 18 F.4th at 1188. Under that interpretation, proof of injury would effectively resolve the merits. But "[s]uch reasoning flouts *Anderson*'s conclusion." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 236 n.33 (5th Cir. 2020).

Plaintiffs cannot shoehorn their theory into the *Anderson-Burdick* framework by describing the "burden" as the "nullification" of a "lawfully cast ballot." *See* Blue Br.15. That assumes the registration was complete when the ballot was deposited. But it was not. The right to vote includes the right to have a valid ballot counted. *See Reynolds v. Sims*, 377 U.S. 533, 555 n.29,

13

562 (1964). But a same-day applicant registers and votes at the same time. The ballot remains "retrievable" while election officials verify the applicant's identification, update the statewide database, search for duplicate registrations, and conduct address verification. N.C. Gen. Stat. §163-82.6B(c)-(d). Nor does the return of an address-verification mailing as undeliverable, by itself, end the process. Officials check for data-entry errors, attempt notice by mail, telephone, or email, and permit the applicant to establish residence with additional documentation or an appearance at canvass. JA19-20, JA1901-1906. The challenged rule therefore does not withdraw the ordinary franchise from an already registered voter; it governs how a pending post-deadline application is completed and the process for determining whether the applicant became registered. The Constitution permits reasonable procedures for making that determination. *See Crawford*, 553 U.S. at 196 (plurality op.).

2. **Most voters are not burdened at all by SB 747, and any burden on those affected is de minimis at most.**

SB 747 imposes no additional burden on most same-day registrants. Indeed, for most same-day registrants, the challenged rule creates no new affirmative obligation at all. The voter registers, presents the required documents, and votes—just as before. An additional step arises only when the verification mailing is returned and the issue cannot be traced to a data-entry error.

Any de minimis burdens on the affected few are "irrelevant" because they are "'special burden[s] on' some voters," not categorical burdens on all voters. *Crawford*, 553 U.S. at 204-05 (Scalia, J., concurring in judgment) ("[O]ur precedents refute the view that individual impacts are relevant."). To state a claim, Plaintiffs must allege a "significant increase over the usual burdens of voting" for "most voters." *Id.* at 198 (plurality op.).

The claimed burden here flunks that test. The adverse outcome Plaintiffs emphasize requires an applicant to miss the ordinary registration deadline, register via the same-day privilege, have the verification mailing returned before the cutoff, remain unverified after officials check for a data-entry error, obtain no relief through attempted notice, fail to establish residence through documentary cure or an appearance at canvass, and remain unverified when canvass concludes. That sequence might occur. But it is hardly illustrative of what the rule ordinarily requires of same-day registrants—let alone "most voters." *Id.*

Even for the small group actually affected by the verification rule, the cure process is as simple as producing another qualifying document or appearing before the county board. *See* JA5; N.C. Gen. Stat. §163-230.1(e1). Those accommodations alleviate any supposed burdens, indicating that the challenged law "does not implicate the right to vote at all." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020) (finding no burden on

voters where there are "numerous avenues to mitigate" non-counting). And even if those curative steps require some effort, they are significantly less demanding than the travel, document collection, and government-identification process that *Crawford*'s plurality concluded did not substantially burden most voters. 553 U.S. at 198-99; *see also Brnovich*, 594 U.S. at 669, 678, 683 (citing *Crawford*, 553 U.S. at 198) (concluding that "[h]aving to identify one's own polling place and then travel there to vote" in person, "making a trip to the department of motor vehicles" to obtain a photo-ID, or "going to a mailbox, a post office, an early ballot drop box, or an authorized election official's office" to return a mail ballot, are part of the "usual burdens of voting").

To the extent Plaintiffs still claim the verification rule "burdens" those few affected voters, it is quintessentially de minimis. At that end of the *Anderson-Burdick* sliding scale, election laws imposing only a "modest" burden "will be upheld if the state can 'articulate' its 'important regulatory interests'"—a requirement that "is not a high bar." *Buscemi v. Bell*, 964 F.3d 252, 263 (4th Cir. 2020); *compare Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 139 (3d Cir. 2022) (The *Anderson-Burdick* test "does not apply … where the burden on a constitutional right is no more than de minimis."). Accordingly, courts have repeatedly rejected *Anderson-Burdick* challenges to restrictions on same-day registration. *See, e.g., Harlan v. Scholz*, 866 F.3d 754, 759, 761 (7th

Cir. 2017) (vacating a preliminary injunction where plaintiffs failed to show more than minimal harm from Illinois's county-tiered election-day registration system); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 630-35 (6th Cir. 2016) ("The notion that … elimination of same day registration disparately imposes anything more than a 'minimal' burden on some African Americans ignores the abundant and convenient alternatives that remain for all Ohioans to vote.").

That 72.28% of "voters funneled into the SB 747 notice-and-cure process had their ballots rejected" does not alter the character of the burden. *See* Blue Br.54. As Plaintiffs acknowledge, that figure considers only applicants whose first mailing was returned and who therefore entered the cure process. *Id.* at 54 n.13; JA2047-48. It says nothing about the much larger group of same-day registrants who never had to cure, and it does not establish why particular registrants remained unverified.

Even if Plaintiffs could establish that heavier burdens may fall on the limited subset affected by the verification rule, Plaintiffs still cannot show a basis for invalidating the challenged provision statewide. *Crawford* recognized that Indiana's law might impose "somewhat heavier burden[s]" on a limited number of voters, but in rejecting the facial challenge, emphasized that the record did not quantify the affected group or the magnitude of its burden and that the provisional-ballot procedure mitigated

that burden. 553 U.S. at 199-203. The same evidentiary gap remains here. Plaintiffs' 72% aggregate rejection rate combines voters who failed to submit timely cure documentation with voters whose submissions were rejected; it does not show how many eligible voters provided accurate residence information yet lost their ballots because of official or postal error. The figure therefore neither quantifies the subset bearing the asserted burden nor shows that the State's error-checking and notice-and-cure safeguards failed to mitigate that burden.

### 3. North Carolina's strong interests justify the minimal burden.

North Carolina's interests in accurate registration, timely eligibility determinations, and orderly completion of canvass justify any residual burden. Same-day registration compresses registration, voting, address verification, notice, cure, and final tabulation into the period between early voting and canvass. The State may reasonably resolve whether the address associated with a retrievable ballot is accurate before including it in the final count. *See Crawford*, 553 U.S. at 196-97.

Because SB 747 ordinarily requires no additional action from a same-day registrant, it falls at the most deferential end of *Anderson-Burdick* review. North Carolina need not prove that its chosen safeguard is the only—or best—way to serve those interests. *Anderson-Burdick* does not require "elaborate, empirical verification" of every legislative judgment. *Timmons*,

520 U.S. at 364. And when a law imposes a "minimal" burden on the right to vote, this Court applies rational basis review. *See Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716-19 (4th Cir. 2016); *see also S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 759 (4th Cir. 2010). North Carolina's interest in accurate, "orderly" elections clears that hurdle by a mile. *Crawford*, 553 U.S. at 191, 196-97 (plurality opinion); *Mays v. LaRose*, 951 F.3d 775, 784, 792-93 (6th Cir. 2020) (Ohio's "important regulatory interest in the orderly administration of elections" outweighed minimal state law burdens.).

## II. The district court correctly rejected Plaintiffs' Twenty Sixth Amendment claim.

The Twenty Sixth Amendment prohibits a State from denying or abridging the right to vote "on account of age." U.S. Const. amend. XXVI, §1. SB 747 does neither. The challenged provision draws no age line and applies the same address-verification rule to every same-day registrant, whether 18 or 80. Plaintiffs thus must prove that age discrimination actually motivated the General Assembly's decision. *See Lee*, 843 F.3d at 607. After a five-day bench trial, the district court found it did not. JA105. That factual finding is reviewed for clear error. *Pullman-Standard v. Swint*, 456 U.S. 273, 287-90 (1982). Plaintiffs cannot obtain de novo review merely by relabeling their disagreement with the court's credibility determinations and factual inferences as a defect in the legal standard.

The Court need not decide whether *Arlington Heights* supplies the governing framework. No controlling authority requires its wholesale application to a Twenty-Sixth Amendment claim. The Fifth and Seventh Circuits have emphasized the limited precedent interpreting the Amendment, and neither adopted *Arlington Heights* as the necessary test. *See Tully v. Okeson*, 78 F.4th 377, 382-88 (7th Cir. 2023); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 183-94 (5th Cir. 2020). But the point is academic here because the district court assumed *Arlington Heights* applied and analyzed every factor. JA94-105 ("Even if *Arlington Heights* applies … which is doubtful, the factors weigh in favor of Defendants.").

Plaintiffs' principal argument misreads *Arlington Heights*. The question is whether a discriminatory purpose was "a motivating factor" in the challenged governmental decision—not whether a biased sentiment can be found somewhere in the broader political process. *See Arlington Heights*, 429 U.S. at 265-66. Legislatures are not vicariously liable for every statement made by every constituent or advocate who seeks to influence a bill. *Brnovich* squarely rejected the premise that legislators are the "mere dupes or tools" of a bill's outside proponents. 594 U.S. at 689-90. A plaintiff must connect the asserted bias to the decisionmakers' own action, while overcoming the presumption of legislative good faith. *See Alexander v. S.C. State Conf. of the*

*NAACP*, 602 U.S. 1, 10 (2024); *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303-05 (4th Cir. 2020).

The district court found that connection absent. It credited testimony that lobbyists Cleta Mitchell and Jim Womack opposed same-day registration generally, regardless of the registrant's age or political preference. JA38-39, JA99. No legislator requested age-based data concerning same-day registrants, and no legislator made an anti-youth statement. JA101. Most importantly, the General Assembly rejected the lobbyists' preferred policies: it did not eliminate same-day registration and did not retain their proposal to make same-day ballots provisional. JA100-101. Those findings distinguish *Mi Familia Vota v. Fontes*, 129 F.4th 691, 727-28 (9th Cir. 2025), where the Ninth Circuit found that evidence tied the challenged laws to outside advocates, and legislators credited those advocates for the enacted text. Here, by contrast, the court found independent legislative judgment. JA103. Plaintiffs' theory would impute to the General Assembly the motives of outside advocates whose preferred policies it rejected.

Plaintiffs' impact evidence does not cure the intent problem. Their percentages principally show that younger voters use same-day registration more frequently than other members of the statewide electorate. But greater use of a voting method is not proof that a facially neutral rule governing that

method is discriminatory. The meaningful comparison is among similarly situated same-day registration voters exposed to the verification and cure process. *See Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 880-81 (4th Cir. 2023). Plaintiffs' own figures show that young voters constituted 40.4% of voters entering notice-and-cure and 41.5% of rejected ballots—nearly proportional shares. *See* Blue Br.48-49 (citing JA2047-48).

*Arlington Heights* recognizes that impact can be circumstantial evidence, but absent a stark pattern explainable only by age, impact is not by itself determinative. 429 U.S. at 265-66. This record presents no such pattern. At most, Plaintiffs identify a small disparity attributable largely to differing rates of same-day registration use against a record otherwise showing regular legislative procedure, no age data, no discriminatory statements by decisionmakers, and an age-neutral administrative rule. Because Plaintiffs failed at *Arlington Heights* step one, the burden never shifted. Even if it had, the longstanding timing problem with completing mail verification before canvass and the State Board's role in designing the final provision would independently support the same decision. The judgment on the Twenty Sixth Amendment claim should be affirmed.

## CONCLUSION

The judgment of the district court should be affirmed.

22

Respectfully submitted,

*/s/ Gilbert C. Dickey*

Gilbert C. Dickey
Conor D. Woodfin
James E. Marmaduke
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd.
Suite 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com

July 30, 2026

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Rules 29(a)(5) and 32(a)(7)(B) because it contains 4,605 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared using Microsoft Word in 14-point Palatino.

Dated: July 30, 2026

/s/ *Gilbert C. Dickey*
Gilbert C. Dickey
*Counsel for Amicus*

CERTIFICATE OF SERVICE

I certify that on July 30, 2026, I filed this brief with the Clerk of Court using the appellate CM/ECF system, which will provide notice and service on counsel for all parties.

Dated: July 30, 2026

*/s/ Gilbert C. Dickey*
Gilbert C. Dickey
*Counsel for Amicus*